**NATURAL RESOURCES DEFENSE COUNCIL, INC., Petitioner,**

v.

**Carol M. BROWNER, Administrator, Environmental Protection Agency, Respondents.**

No. 94–1647.

United States Court of Appeals, District of Columbia Circuit.

Argued May 15, 1995.

Decided June 27, 1995.

Sharon Buccino, Washington, DC, argued the cause, for petitioner. With her on the briefs was David M. Driesen, Washington, DC. David G. Hawkins, Washington, DC, entered an appearance.

Ronald M. Spritzer, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause, for respondents. With him on the brief were Lois J. Schiffer, Asst. Atty. Gen., and Jan M. Tierney, Atty., E.P.A., Washington, DC.

Before: WALD, ROGERS and TATEL, Circuit Judges.

ROGERS, Circuit Judge:

The 1990 amendments to the Clean Air Act revised the regulatory framework for achieving national air quality goals. Among other changes, the amendments altered the schedule of State Implementation Plan ("SIP") submissions and Environmental Protection Agency ("EPA") responses thereto, and strengthened the sanctions that apply in the event of state noncompliance. Under § 179(a), 42 U.S.C. § 7509(a) (Supp. V 1993), an EPA finding of one of four possible SIP defects will trigger mandatory sanctions unless the state takes corrective action within 18 months. Petitioner Natural Resources Defense Council ("NRDC") challenges an

The purpose in the award of reimbursement for fees that would not have been incurred "but for" the Act is to ensure that "officials [and here derivative 'subjects'] who are investigated by independent counsels will be subject only to paying those attorneys' fees that would normally be paid by private citizens being investigated for the same offense by" federal executive components such as the United States Attorney.

*Dutton*, 11 F.3d at 1080. In assessing the "but for" requirement as regarding the Iran/Contra investigation we have noted that "the investigation would never have occurred, nor the fees have been incurred, 'but for' the appointment of the Independent Counsel under the Act." *Id.; see also In re North (Gardner Fee Application)*, 30 F.3d 143, 146 (D.C.Cir.1994) (per curiam).

Furthermore, Cave was a cooperating witness for four and one half years before he became a "subject" of the investigation. We stated in *Shultz* that

> it is not reasonable to expect that a professional prosecutor, as opposed to an independent counsel under the Act, would have been making subjects out of persons theretofore treated as witnesses four and one-half years after the commencement of an investigation, absent some circumstances far more extraordinary than any displayed to us here.

*In re North (Shultz Fee Application)*, 8 F.3d 847, 851 (D.C.Cir.1993) (per curiam). Therefore, based on the record before us and our prior case law, it is exceedingly clear that Cave would *not* have incurred the requested attorneys' fees "but for" the requirements of the Act.

### D. Reasonableness

■ We must now determine whether Cave's attorney charged a reasonable hourly rate and whether the time expended by the attorney in defending Cave was reasonable. *See Gardner*, 30 F.3d at 146. The Department of Justice argues in its evaluation of

Cave's petition that the $240 per hour fee charged to Cave by his counsel Stephen Horn may be unreasonable based on discussions appearing in the legislative history of recent amendments to the Act. We have rejected this argument in two prior opinions and thus no further discussion on this point is necessary here.[2] *See In re North (Armitage Fee Application)*, 50 F.3d 42, 43–45, (D.C.Cir.1995), *and In re North (Gardner Fee Application)*, 30 F.3d at 145 n. 2.

In his petition, Cave requests $19,912.50 in legal fees. The petition is supported by detailed invoices, underlying office records, and the declaration of qualified counsel. The Department of Justice takes limited issue with the hours expended in this representation but does suggest that our case law bars reimbursement for "attorney time expended 'monitoring' the ongoing investigation of Clair George," a CIA official. It is true that this Court in *Gardner* found that Norman Gardner could not be reimbursed for fees incurred in the course of his counsel's "defensive monitoring" of the case against Clair George. *Gardner*, 30 F.3d at 147. However, the facts of the Cave case are entirely different from the facts in *Gardner*. Cave was subpoenaed and actually testified at both of Clair George's trials. It is extremely reasonable, and is in fact good lawyering, for Cave's attorney to be present at the George trials during his client's testimony.

Based on our review of the invoices, billing statements, and declarations provided in the record, we find that Cave's request for attorneys' fees in the amount of $19,912.50 is well-documented and extremely reasonable and we therefore allow recovery for that amount in full.

### III. CONCLUSION

For the reasons set forth above, it is ordered that George Cave be awarded $19,-912.50 in reasonable attorneys' fees he in-

---

**2.** We note that the $240 per hour was charged for work performed by Stephen Horn, a shareholder at the firm of Schmeltzer, Aptaker & Shepard, P.C. The hourly rate charged to Cave for work performed by junior attorneys and paralegals at the firm ranged from $150 to $50. We find all of these rates to be extremely reasonable.

EPA final rule that permits a state to halt the 18–month "sanctions clock," when it is triggered by an EPA finding of incompleteness or nonsubmittal, by submitting a complete plan, even if that plan is ultimately unapprovable due to substantive inadequacies. Because the language of § 179 plainly leads to the approach adopted by EPA, and NRDC has pointed to no persuasive evidence that Congress intended otherwise, we deny the petition for review.

# I.

**A. Statutory Framework.** The Clean Air Act, as amended in 1970 and 1977,[1] establishes a partnership between EPA and the states for the attainment and maintenance of national air quality goals. *See* 42 U.S.C. §§ 7401–7515 (1988 & Supp. V 1993). Under this regime, EPA has set health-based primary "National Ambient Air Quality Standards" ("NAAQS") for six pollutants. *See* 40 C.F.R. part 50 (1994).[2] The states are responsible in the first instance for meeting the NAAQS through state-designed plans that provide for attainment, maintenance, and enforcement of the NAAQS in each air quality control region. Thus, each state determines an emission reduction program for its nonattainment areas, subject to EPA approval, within deadlines imposed by Congress.

In 1990, Congress amended the Act to revise the timing and content of the SIP requirements and provide new incentives and sanctions to encourage state compliance with Clean Air Act obligations. *See* Clean Air Act of Amendments of 1990, Pub.L. No. 101–549, 104 Stat. 2399. The 1990 amendments extended the Act's attainment deadlines, but added short-term deadlines for many intermediate steps, including SIP submissions. The amendments also created new mandatory sanctions for states that fail to comply with SIP submission and implementation duties.

Section 110 of the Clean Air Act, 42 U.S.C. § 7410, sets forth the basic processes and requirements governing SIP submissions. Within 60 days of the submission, but no later than six months after the submission deadline, EPA must review each submission for completeness. 42 U.S.C. § 7410(k)(1)(B). The Act defines a complete submission as one that contains "the information necessary to enable" EPA to "determine whether the plan submission complies" with the NAAQS requirements. *Id.* § 7410(k)(1)(A). Pursuant to the Act, EPA has developed criteria for evaluating whether a plan meets the completeness requirement. *See* 40 C.F.R. § 51.103 & App. V.[3] If EPA finds the plan complete, it has twelve months to determine whether the plan meets the substantive requirements of the Act. 42 U.S.C. § 7410(k)(2). At this stage, EPA evaluates the detailed models for pollution control submitted by states and compares them with the federal standards and attainment deadlines.[4] EPA may approve the plan in whole or in part, disapprove the plan, or conditionally approve the plan based on a state commitment to adopt specific enforcement methods. *Id.* § 7410(k)(3)–(4).

Congress established a number of incentives for states to comply with SIP submission and implementation deadlines. These include mandatory sanctions, discretionary

---

1. Although the Clean Air Act was enacted in 1963, "it was the Clean Air Act Amendments of 1970, Pub.L. No. 91–604, 84 Stat. 1676 (1970), that gave the Clean Air Act the basic structure it retains today." *Coalition for Clean Air v. Southern Cal. Edison*, 971 F.2d 219, 221 (9th Cir. 1992).

2. In addition to ground-level ozone, NAAQS cover lead, sulfur dioxide, carbon monoxide, nitrogen oxide, and small particulate matter. *See id.*

3. Under these criteria, a complete plan must include (among other things) evidence of legal authority under state law to adopt and implement the plan, copies of regulations and orders necessary to implement the program, and technical documentation of the state program demonstrating its compliance with NAAQS attainment deadlines. *See id.*

4. For each of the NAAQS pollutants, the Act provides separate attainment deadlines depending on the severity of the pollution problem in a particular area. *See* 42 U.S.C. §§ 7511 (ozone), 7512 (carbon monoxide), 7513 (particulate matter), 7514a (sulfur oxides, nitrogen dioxide, and lead). For each type of pollutant and area classification, the Act specifies a range of different programs that states must adopt to meet NAAQS attainment goals. *See, e.g., id.* § 7511a (ozone plan provisions).

sanctions, and imposition of a Federal Implementation Plan ("FIP"). Of importance here, § 179 requires EPA to impose mandatory sanctions on states that fail to comply with SIP obligations. That provision lists several EPA findings that trigger an 18-month sanctions clock, at the end of which EPA must impose one of two sanctions "unless *such deficiency* has been corrected." 42 U.S.C. § 7509(a) (emphasis added). The triggering events are: a finding of state failure to make a required plan submission or failure to submit a complete plan; disapproval of a SIP in whole or in part; or a finding of state failure to implement any element of an approved plan. *Id.* § 7509(a)(1)–(4). Once sanctions have been imposed, they remain in place until EPA determines that the state "has come into compliance" with its Clean Air Act obligations. *Id.* § 7509(a).[5]

In addition, § 110(m), 42 U.S.C. § 7410(m), authorizes EPA to impose discretionary sanctions on a state at any time after EPA makes one of the four findings set forth in § 179(a). Consequently, in the event of state delay in submission and implementation of NAAQS program elements, EPA can levy sanctions without waiting for expiration of the 18-month period required before mandatory sanctions are imposed. The available sanctions are the same as those under the mandatory provision, but unlike the mandatory § 179(b) sanctions, discretionary sanctions are not limited to any particular nonattainment area and can be imposed statewide. *See Criteria for Exercising Discretionary Sanctions Under Title I of the Clean Air Act,* 59 Fed.Reg. 1476 (Jan. 11, 1994).

The 1990 Amendments continued EPA's responsibility to prepare and impose a FIP within two years following a state's failure to develop and implement a complete and approved plan. *See* 42 U.S.C. § 7410(c). In the event of a deficiency finding due to nonsubmission, incompleteness, or disapproval, EPA must promulgate a federal plan for the attainment or maintenance of NAAQS in a particular region. The FIP provides an additional incentive for state compliance because it rescinds state authority to make the many sensitive technical and political choices that a pollution control regime demands. The FIP provision also ensures that progress toward NAAQS attainment will proceed notwithstanding inadequate action at the state level. In contrast to the mandatory sanctions, which a state can avoid merely by correcting the submission deficiency, FIP promulgation can be avoided only if EPA has actually approved the state's SIP submission.[6]

Finally, the Act provides that when a nonattainment area fails to meet an attainment deadline, EPA must reclassify that area to the next higher classification. For example, a marginal ozone nonattainment area must be reclassified to a moderate nonattainment area within six months after the attainment date has not been met. *See* 42 U.S.C. § 7511(b)(2); *see also id.* §§ 7512(b)(2) (carbon monoxide), 7513(b)(2) (particulate matter). Once reclassified, an area must meet the requirements of the new classification. *See, e.g., id.* §§ 7511a(i), 7511(b)(4) (specifying additional obligations applicable to severe ozone areas that fail to attain). Because the control regime increases in cost and complexity with each step up the nonattainment ladder, *see, e.g., id.* § 7511a(b)–(d) (specifying additional control measures for higher ozone classification levels, such as enhanced vehicle inspection and maintenance programs), the reclassification provisions function as yet another incentive for states to attain their air

---

**5.** Under § 179(b), 42 U.S.C. § 7509(b), there are two mandatory sanctions for noncomplying states: (1) limitations on certain federal highway funding, and (2) "offset" limitations on certain developments in affected areas that require each new stationary emission source to be paired with a reduction in area emissions amounting to double the amount of increased emissions from the new source. One of these sanctions must be imposed if a state has not corrected the § 179 deficiency within 18 months after the EPA finding; the other sanction must be imposed within the next six months if the deficiency remains uncorrected. If EPA determines that the state has not acted in good faith, however, both sanctions apply simultaneously. 42 U.S.C. § 7509(a).

**6.** Section 110(c)(1) requires EPA to promulgate a FIP "unless the State corrects the deficiency, and the Administrator approves the plan or plan revision, before the Administrator promulgates such Federal implementation plan." 42 U.S.C. § 7410(c)(1).

quality objectives within the statutory deadlines.

**B. Final Rule.** EPA's final rule interpreting § 179 established the order in which EPA will apply the mandatory sanctions of § 179(b) and the procedures for starting and stopping the 18–month sanctions clock. *See* 59 Fed.Reg. 39,832, 39,837–52 (August 4, 1994). EPA explained that under its reading of § 179, a state can halt the sanctions clock by correcting the specific SIP deficiency that triggered the clock under § 179(a). In particular, the final rule provides that when a state fails to submit a complete plan within six months of the submission deadline, the subsequent submission of a complete plan will permanently stop and reset the sanctions clock, even if the plan is ultimately unapprovable. *Id.* at 39,857–58. Thus, when EPA determines that a state has missed a submission deadline or submitted an incomplete plan, the 18–month countdown begins, and if the state submits a plan that meets EPA completeness criteria within that 18–month period, no sanctions will apply. EPA then has twelve months to review the plan's technical elements for compliance with the Act's substantive requirements; if EPA finds one or more of these elements lacking, EPA will disapprove the plan and a new 18–month clock will begin.

## II.

█ Petitioner NRDC timely petitioned for review of EPA's interpretation, *see* 42 U.S.C. § 7607(b)(1), taking issue with the type of state action EPA views as sufficient to halt the sanctions clock when a state has failed to submit a complete SIP. NRDC contends that the final rule conflicts with Congress' intent to impose mandatory sanctions no later than 18 months after EPA finds that a state has not submitted an approvable plan. In the alternative, NRDC maintains that even if Congress' intent is unclear, the rule is unreasonable because it "destroys the intricate structure" of the 1990 amendments, which Congress designed to ensure that states take necessary steps to comply with federal air quality standards by statutory deadlines. Accordingly, the issue in the instant appeal is EPA's construction of

the term "such deficiency" to refer to each specific finding or deficiency listed in § 179(a), whereby a state can halt a sanctions clock, triggered by an EPA finding of incompleteness, by submitting a complete plan.

The court reviews NRDC's challenge pursuant to the framework set forth in *Chevron USA, Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). Under this analysis, the court must first exhaust the "traditional tools of statutory construction" to determine whether Congress has spoken to the precise question at issue. *Id.* at 843 n. 9, 104 S.Ct. at 2781–82 n. 9. If the court can determine congressional intent, "then that interpretation must be given effect." *Kansas City v. Department of Housing & Urban Dev.,* 923 F.2d 188, 191 (D.C.Cir.1991) (citing *United Food & Commercial Workers,* 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987)). If, on the other hand, "the statute is silent or ambiguous with respect to the specific issue," then the court will defer to a "permissible" agency construction of the statute. *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781. We conclude under step one of the *Chevron* analysis that the language and context of § 179 clearly reveal that Congress intended to allow states to avoid mandatory sanctions by correcting only the specific deficiency that initially triggered the sanctions countdown.

Our inquiry begins, as it must, with the text of the statute. *See Demarest v. Manspeaker,* 498 U.S. 184, 187, 111 S.Ct. 599, 602, 112 L.Ed.2d 608 (1991); *United States v. Ron Pair Enterprises, Inc.,* 489 U.S. 235, 241, 109 S.Ct. 1026, 1030, 103 L.Ed.2d 290 (1989). After setting forth several types of EPA deficiency findings—for nonsubmittal, incompleteness, substantive unapprovability, or nonimplementation—§ 179(a) provides that:

> "*unless such deficiency has been corrected* within 18 months after the finding, disapproval or determination referred to in paragraphs (1), (2), (3), and (4), one of the sanctions referred to in subsection (b) of this section shall apply...."

42 U.S.C. § 7509(a) (emphasis added). Under the only natural reading of the term,

"such deficiency" refers to the "state failure[ ]" (as the caption puts it) that gave rise to the EPA finding or determination listed in § 179. As such, the deficiency that must be remedied is the specific deficiency that, by leading to an EPA "finding, disapproval or determination," triggered the sanctions clock. It follows that when EPA activates a sanctions clock because a state has failed to submit a complete SIP, EPA must also halt the clock when the state corrects that specific deficiency. EPA adopted this interpretation in its final rule, *see* 58 Fed.Reg. at 39,850–51, and we agree that the statute requires it.[7]

NRDC's contrary reading of § 179 lacks the textual support necessary to overcome EPA's straightforward construction. NRDC maintains that Congress designed § 179 to address only two types of state SIP deficiencies: a state's failure to submit a SIP that meets the Act's requirements, or a state's failure to implement an approved SIP. Then, after a finding of nonsubmittal or incompleteness, the 18–month clock would be activated and could only be stopped when a state corrects the underlying deficiency by submitting an approvable plan. In formulating state obligations under the Clean Air Act, according to NRDC, Congress did not differentiate between the duty to submit a complete plan and the duty to submit an approvable plan. NRDC notes, for example, that the SIP submission deadlines make no such distinction; rather, they require states only to submit plans that satisfy the statutory criteria—namely, plans that are approvable. *See* 42 U.S.C. § 7410(a)(2) (listing requirements that each plan must satisfy). In

NRDC's view, this indicates that Congress' only concern was that a state timely submit an approvable plan, and that only an approvable SIP can turn off the sanctions clock.

To explain why § 179(a) lists four separate events that activate the 18–month sanctions clock, NRDC distinguishes between administrative findings that trigger the sanctions clock, and "underlying deficiencies" in state compliance that must be corrected to avoid sanctions. NRDC suggests that Congress listed the EPA findings in § 179(a) in order to ensure that the sanctions clock would be promptly activated where plan inadequacies could be readily identified. Under the two-stage procedure established in § 110(k), EPA first makes an essentially ministerial finding of completeness, a process taking at most six months. By contrast, the plan approval process may take up to twelve months due to the more extensive technical analyses necessary to ensure that the SIP meets the Act's substantive requirements. *See* 42 U.S.C. § 7410(k)(1)–(3). By listing incompleteness and nonapproval as separate triggering events, NRDC contends, Congress meant to set the clock ticking at the earliest possible moment, not to establish a separate state duty to submit a complete SIP.

█ Although plausible in theory and principle, NRDC's reading cannot be reconciled with Congress' use of the term "such deficiency" in § 179(a). NRDC points to no specific textual support for its contention that this phrase refers to the failure to submit an approvable SIP. Instead, NRDC maintains that § 179 can be properly under-

---

**7.** EPA finds additional support for its interpretation by comparing § 179(a) with § 110(c)(1), which requires EPA to develop a FIP in the event of state noncompliance. Under § 110(c), EPA must act within two years of a finding or disapproval listed in § 179(a), "unless the State corrects the deficiency, *and the Administrator approves the plan or plan revision,* before the Administrator promulgates such Federal implementation plan." (emphasis added). Because § 110(c) contains a SIP approval requirement that does not appear in § 179(a), EPA maintains that Congress knew how to require EPA approval to prevent a sanction from taking effect, and did not intend such a requirement to halt the sanctions clock under § 179. However, NRDC persuasively responds that inclusion of a specific approval requirement in § 110(c) is not inconsis-

tent with its construction of the phrase "such deficiency" in both § 110(c) and § 179. Under this view, § 110(c) imposes a higher threshold of EPA approval before halting the FIP clock in order to ensure that a working plan is in place for each nonattainment region within two years. By contrast, NRDC reads § 179 to require a state to submit only an approvable plan—a more modest requirement that would not penalize the state for delays caused by the lengthy EPA approval process. NRDC thus explains that the approval requirement in § 110(c) is not superfluous under its interpretation, and for this reason we find EPA's additional textual argument unavailing. By the same token, however, § 110(c) provides no support for NRDC's interpretation of § 179, which (we conclude) conflicts with the plain language of the statute.

stood only in light of the statutory scheme and legislative history that, it asserts, show a clear congressional intent at odds with EPA's interpretation. Where the terms of a statute are unambiguous, further judicial inquiry into the intent of the drafters is generally unnecessary. *See Demarest,* 498 U.S. at 190–91, 111 S.Ct. at 603–04; *Inner City Broadcasting Corp. v. Sanders,* 733 F.2d 154, 158 (D.C.Cir.1984) ("[U]nless contrary indications are present, a court can assume that Congress intended the common usage of the term to apply."). At the same time, "while the immediate statutory text is the 'best evidence' of congressional intent," it is not "the *only* such evidence." *Tataranowicz v. Sullivan,* 959 F.2d 268, 276 (D.C.Cir.1992) (citing *McCarthy v. Bronson,* 500 U.S. 136, 139, 111 S.Ct. 1737, 1740, 114 L.Ed.2d 194 (1991); *Crandon v. United States,* 494 U.S. 152, 158, 110 S.Ct. 997, 1001–02, 108 L.Ed.2d 132 (1990)); *see also American Scholastic TV Programming Found. v. FCC,* 46 F.3d 1173, 1178 (D.C.Cir.1995) ("*ASTV*"). Reference to statutory design and pertinent legislative history may often shed new light on congressional intent, notwithstanding statutory language that appears "superficially clear." *ASTV,* 46 F.3d at 1180 (quoting *Tataranowicz,* 959 F.2d at 277). Here, however, NRDC has presented no persuasive evidence that Congress intended any meaning other than that suggested by a straightforward reading of § 179.

As evidence of Congress' true intent, NRDC points to the role of mandatory sanctions within the statutory scheme as a whole. The Clean Air Act, it contends, established an intricate structure of intermediate steps designed to lead states gradually to attainment of the national air quality standards. Congress intended the 1990 amendments to remedy the failings of the pre–1990 Act, which did not impose specific incremental deadlines and thus led to widespread nonattainment. The 1990 amendments, therefore, included specific deadlines for states to submit emission control plans well in advance of the attainment deadlines and imposed strict deadlines and requirements on EPA's response to state submissions, including prompt sanctions to ensure that the plan submission deadlines were met.

According to NRDC, EPA's rule disrupts this system and perversely rewards state delay. A state that submits a complete but unapprovable SIP on schedule, for example, will face sanctions sooner than a state that submits an incomplete SIP, waits until just before the 18–month period expires, and then submits a complete SIP. If that SIP ultimately proves unapprovable, moreover, it is possible that four and a half years might elapse between the initial SIP deadline and the imposition of mandatory sanctions. In some circumstances, NRDC notes, EPA's rule may allow a state to avoid mandatory sanctions until after the attainment dates have already passed. Finally, NRDC notes that the rule will create the anomalous result that FIPs will be implemented in many cases before states face sanctions for their failure to submit approvable state plans, thereby rendering sanctions superfluous. Thus, NRDC maintains that EPA's interpretation conflicts with Congress' intent to strengthen the sanctions regime in tandem with a graduated program of state compliance.

As NRDC views it, EPA's interpretation destroys an otherwise seamless web of incremental state obligations that together lead inexorably to NAAQS attainment. But § 179 is only one of several mechanisms in the 1990 amendments that encourage state compliance. *See supra* Part I. EPA's discretionary authority under § 110(m) can be used to counteract a state's abuse of the SIP submission timeline, for example. At the same time, the attainment deadlines remain intact, complete with additional program obligations in the event of nonattainment, irrespective of a state's dereliction in the SIP process. In addition, the statute requires EPA to impose a FIP within two years of a deficiency finding—a control regime that remains in place until the state submits and gets approved its own SIP.[8] Furthermore,

---

**8.** Although NRDC suggests that Congress established the mandatory sanctions regime precisely because discretionary sanctions and FIPs were inadequate incentives for state compliance, the legislative history indicates that Congress viewed the FIPs as a useful backstop to state planning. *See* H.R. REP. No. 490, 101st Cong., 2d Sess. 229

EPA observes that even if states abuse the SIP submission schedule, under most circumstances the § 179 sanctions will precede the attainment deadlines. Hence, although Congress clearly established mandatory sanctions to increase the pressure on recalcitrant states and EPA, the additional delay allowed by EPA's interpretation, as compared with that urged by NRDC, is not incompatible with the multi-faceted statutory scheme as a whole. *See Natural Resources Defense Council, Inc. v. EPA,* 822 F.2d 104, 113 (D.C.Cir.1987) ("statutes are rarely, if ever uni[-]dimensionally directed towards achieving or vindicating a single public policy.... While a broad public policy goal may well be the animating force driving the legislation, achievement of actual passage of the measure invariably requires compromise and accommodation."); *cf. Natural Resources Defense Council, Inc. v. EPA,* 22 F.3d 1125, 1139 (D.C.Cir.1994) (finding no inconsistency in EPA's setting an implementation date for vehicle inspection programs *after* Clean Air Act attainment deadline). As such, NRDC's reference to the statutory scheme as evidence that EPA's rule misconstrues congressional intent is unavailing.

Nor is NRDC's reliance on the legislative history of the 1990 amendments persuasive. In part, NRDC points to general expressions of the need to avoid delay, but these provide no real insight into the question presented and consequently carry no weight.[9] NRDC's reliance on a statement by the managers of the Senate bill is equally unpersuasive. Explaining the conference agreement, their statement asserts that: "In the event more than 18 months elapse after submission is required and the state program has not been submitted *and approved,* the conference agreement requires EPA to impose a sanction." 136 CONG.REC. S16,942 (Oct. 27, 1990) (emphasis added).[10] Even assuming it is probative of congressional intent,[11] this statement lacks the deliberate and definite quality of persuasive legislative history. EPA points out that the remedy for deficient plan submissions was not raised in the Conference Report or specifically addressed except as provided in the statute itself, thereby undermining the significance of the summary of the conference agreement. In addition, if the Senate managers' interpretation were correct, it could not be reconciled with the clear approvability requirement in § 110, *see supra* note 7. The managers' statement also appears inconsistent with the second piece of legislative history on which NRDC relies, the House Report's description of § 179. In the single sentence cited by NRDC, the report states that: "This system of mandatory sanctions is intended to provide a clear incentive to States for the development and implementation of *approvable* State air quality plans." House Report at 228. The two pieces of legislative history thus conflict about whether a plan submission must be *approved* or merely *approvable* in order to avert sanctions. While NRDC acknowledges this tension and contends that under either interpretation EPA's rule falls short, the House Report's treatment of the mandatory sanctions provision actually cuts against NRDC's interpretation.

(1990) ("House Report") ("Historically, the FIP process has been effective.").

9. *Compare* Brief for Petitioner at 26 (citing House Report at 228 ("The Committee intends the mandatory sanction to send a strong message that Congress is very serious about the effort to achieve clean air, and will require all States to comply fully with the provisions of the Clean Air Act.")) *with United States v. Granderson,* — U.S. —, —, 114 S.Ct. 1259, 1265, 127 L.Ed.2d 611 (1994) ("[W]e cannot divine from the legislators' many 'get tough on drug offenders' statements any reliable guidance to particular provisions. None of the legislators' expressions ... focuses on 'the precise meaning of the provision at issue in this case.' ") (citation omitted).

10. Although this statement actually refers to a state's submission of an operating permit program under a separate Title of the Clean Air Act (§ 502), NRDC maintains that this provision incorporates by reference the sanctions timing schedule in § 179(a)–(b). Thus, to the extent it reflects Congress' intent about the timing of the sanctions clock in § 502, that intent would also apply to § 179.

11. *But see Brock v. Pierce County,* 476 U.S. 253, 263, 106 S.Ct. 1834, 1840–41, 90 L.Ed.2d 248 (1986) (statements of individual legislators provide evidence of Congress' intent when consistent with statutory language and other legislative history); *Coalition for Clean Air v. South Cal. Edison,* 971 F.2d 219, 227 (9th Cir.1992).

In describing the mandatory sanctions mechanism, the House Report states:

Section 179(a) outlines the State failures which are sanctionable once the EPA Administrator makes the finding or determination or takes a disapproval action.... These failures include failure to submit a plan or plan element meeting the minimum criteria of section 110(k), EPA disapproval of a State plan in whole or in part, failure to make any required submission satisfying the minimum criteria of section 110(k), and failure to implement any requirement of an approved plan. If the State has not corrected such deficiency within 18 months from the Administrator's finding, determination or disapproval, [the mandatory sanctions will apply].

House Report at 227. By apparently equating the term "such deficiency" with "State failures which are sanctionable," and identifying "[t]hese failures" as the four kinds of shortcomings listed in § 179(a), this passage strongly reinforces EPA's interpretation that "such deficiency" refers to any of the shortcomings listed in § 179(a). The House Report makes no distinction between EPA administrative findings and the underlying state failures; rather, failure to submit a complete SIP is defined as an independently sanctionable deficiency. As such, it is natural to conclude that correction of that individual deficiency is sufficient to avoid the correlative sanctions.

On balance, the legislative history of § 179 appears to support EPA's interpretation, not NRDC's. In light of the clear meaning of the words used by Congress, and "absent a clearly expressed legislative intention to the contrary," *Consumer Product Safety Comm'n v. GTE Sylvania, Inc.*, 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980), we uphold EPA's construction and it is unnecessary to reach the second step of the *Chevron* analysis. *See Chevron*, 467 U.S. at 843, 104 S.Ct. at 2781–82. Accordingly, we deny the petition for review.