United States Court of Appeals

 FOR THE DISTRICT OF COLUMBIA CIRCUIT

 Argued September 5, 2001 Decided November 9, 2001 

 No. 00-5195

 American Bankers Association, 
 Appellant

 v.

 National Credit Union Administration, et al., 
 Appellees

 Appeal from the United States District Court 
 for the District of Columbia 
 (No. 99cv00042)

 Eric Mogilnicki argued the cause for appellant. With him 
on the briefs were Christopher R. Lipsett, Jonathan M. 
Mastrangelo, John J. Gill and Michael F. Crotty. Kimberly 
A. Parker entered an appearance.

 Michael E. Robinson, Attorney, U.S. Department of Jus-
tice, argued the cause for appellees. With him on the brief 
were Kenneth L. Wainstein, U.S. Attorney, Jacob M. Lewis, 

Attorney, U.S. Department of Justice, and John K. Ianno, 
Counsel, National Credit Union Administration.

 William J. Donovan, David M. Cherubin, Paul J. Lam-
bert, Gerard P. Finn and Robert M. Krasne were on the joint 
brief for intervenors-appellees Credit Union National Associ-
ation, National Association of Federal Credit Unions, and 
State Employees Federal Credit Union. Theodore W. Ruger 
and Peter S. Leyton entered appearances.

 Before: Randolph, Rogers and Tatel, Circuit Judges.

 Opinion for the Court filed by Circuit Judge Tatel.

 Tatel, Circuit Judge: The American Bankers Association 
challenges a National Credit Union Administration rule gov-
erning chartering and membership standards for federal 
credit unions. According to the ABA, the rule violates the 
Credit Union Membership Access Act of 1998, pursuant to 
which the Administration issued the rule. Except for one 
claim that we dismiss as moot and another as unripe, we find 
the ABA's arguments without merit and affirm the district 
court's dismissal of the case.

 I.

 The Federal Credit Union Act (FCUA), 12 U.S.C. ss 1751-
1795k, provides for the establishment of federal credit unions 
and governs their operations. A credit union is a "coopera-
tive association organized in accordance with the provisions of 
[the FCUA] for the purpose of promoting thrift among its 
members and creating a source of credit for provident or 
productive purposes." Id. s 1752(1). The National Credit 
Union Administration "may prescribe rules and regulations 
for the ... administration of the [FCUA]," id. s 1766(a), and 
charters, examines, and supervises federal credit unions, see 
id. ss 1753, 1754, 1756.

 As originally enacted, the FCUA limited credit union mem-
bership to "groups having a common-bond of occupation or 
association, or to groups within a well-defined neighborhood, 
community, or rural district." FCUA, Pub. L. No. 73-467, 
s 9, 48 Stat. 1216, 1219 (1934) (codified at former 12 U.S.C. 

s 1759 (amended 1998)). Starting in 1982, the Administra-
tion began permitting multiple occupational groups, i.e., 
groups with different common bonds, to combine into one 
"multiple common-bond credit union." Interpretative Ruling 
and Policy Statement (IRPS) 82-1, 47 Fed. Reg. 16,775, 
16,775 (Apr. 20, 1982). In 1998, the Supreme Court, affirm-
ing a decision of this court, held that the FCUA prohibited 
such credit unions. See Nat'l Credit Union Admin. v. First 
Nat'l Bank & Trust Co., 522 U.S. 479, 499-501 (1998). Later 
that year, however, Congress 
amended the FCUA to authorize multiple common-bond 
credit unions. Credit Union Membership Access Act, Pub. L. 
No. 105-219, s 2, 112 Stat. 913, 914-15 (1998) (amending 12 
U.S.C. s 1759(b)).

 As amended, the FCUA permits three types of credit 
unions, each defined by a different "membership field": sin-
gle common-bond credit unions, comprised of one group 
having a common occupational or associational bond; multiple 
common-bond credit unions, comprised of more than one such 
group; and community credit unions. 12 U.S.C. 
s 1759(b)(1)-(3). Pursuant to what the parties call a "grand-
father clause," the FCUA exempts certain previously existing 
"members and groups" from the new membership field provi-
sions. Id. s 1759(c)(1). The FCUA also imposes several 
limitations and conditions on multiple common-bond credit 
union formation and growth, including: (1) restricting multi-
ple common-bond credit unions to groups with less than 3,000 
members, id. s 1759(d)(1), unless certain exceptions apply, 
including where a larger group "could not feasibly or reason-
ably" form its own credit union, id. s 1759(d)(2)(A); (2) 
directing that the Administration "encourage" a group seek-
ing to join an existing credit union to form its own separately 
chartered credit union instead, id. s 1759(f)(1)(A); (3) requir-
ing that in order to be added to an existing credit union a 
group be within "reasonable proximity" of that credit union, 
id. s 1759(f)(1)(B); and (4) requiring that where an existing 
credit union seeks to include an additional group, the credit 
union must satisfy certain "approval criteria" concerning its 
financial soundness and administrative capabilities, and that 

any harmful effect the expansion will have on any other credit 
union must be "clearly outweighed in the public interest by 
the probable beneficial effect of the expansion," id. 
s 1759(f)(2). Finally, the 1998 Amendments added the word 
"local" to the community credit union definition, thus confin-
ing such credit unions to "well-defined local communit[ies], 
neighborhood[s], or rural district[s]." Id. s 1759(g)(1).

 Following notice and comment, the Administration issued a 
final rule implementing the 1998 Amendments. See IRPS 
99-1, 63 Fed. Reg. 71,998 (Dec. 30, 1998). Several of the 
rule's provisions regarding multiple common-bond credit un-
ions are at issue in this case. First, although the rule allows 
the immediate family and household of a group member, as 
well as "[p]ersons retired as pensioners and annuitants," to 
join the group's multiple common-bond credit union, the rule 
does not count these persons toward the 3000-member limit. 
Id. at 72,002, 72,037. Second, in determining whether a 
group with 3000 or more members "could not feasibly or 
reasonably" form its own credit union, 12 U.S.C. s 1759(d)(2), 
the Administration considers the group's "desire and intent," 
63 Fed. Reg. at 72,002. Third, while the rule requires groups 
with 3000 or more members to "demonstrate why they cannot 
satisfactorily form a separate credit union if they want to be 
added to another credit union," it requires groups with fewer 
than 3000 members to "demonstrate why they can successful-
ly operate a credit union" in order to be separately chartered. 
Id. at 72,001. Fourth, the rule permits healthy multiple 
common-bond credit unions comprised of groups with fewer 
than 3000 members to merge with each other "without regard 
to the statutory analysis that is required when [such groups] 
... seek to join an existing credit union." Id. at 72,003.

 Also at issue in this case are the rule's provisions imple-
menting the FCUA's grandfather clause, "reasonable proxim-
ity" requirement, and "well-defined local community" stan-
dard. See 63 Fed. Reg. at 71,998, 72,003, 72,015, 72,037-38. 
Under the rule, the grandfather clause covers not just indi-
viduals who were members of a group at the time the FCUA 
was amended, but also those who subsequently become mem-
bers of the group. Id. at 72,015. The rule provides that a 

group is within "reasonable proximity" of a credit union if it is 
within the "service area of a service facility of the credit 
union"; a service facility includes a "credit union owned 
electronic facility" other than an automated teller machine. 
Id. at 72,002-03. Finally, the rule establishes criteria to 
implement the statute's "well-defined local community" stan-
dard and adopts a presumption that certain areas, defined by 
political jurisdiction and population, meet that standard. Id. 
at 72,037-38.

 Alleging that these provisions of the rule violate the FCUA, 
appellant, the American Bankers Association (ABA), filed suit 
in the United States District Court for the District of Colum-
bia pursuant to the Administrative Procedure Act. See 5 
U.S.C. s 706. Underlying all of the ABA's claims is its belief 
that the rule is too permissive with respect to credit union 
formation and growth. Except for the provision regarding 
pensioners, which the district court found the ABA's amended 
complaint failed to challenge, the district court concluded that 
each of the challenged provisions reflects a reasonable inter-
pretation of the FCUA and dismissed the amended complaint 
pursuant to Federal Rule of Civil Procedure 12(b)(6).

 Renewing the arguments it made in the district court, the 
ABA appeals. Three organizations representing credit un-
ions intervened to defend the rule. We review the district 
court's Rule 12(b)(6) dismissal de novo. See, e.g., Brown v. 
Plaut, 131 F.3d 163, 167 (D.C. Cir. 1997).

 II.

 Before considering the merits of the ABA's claims, we must 
deal with its preliminary argument that the district court 
erred by failing to direct the Administration to produce the 
administrative record. According to the ABA, the district 
court needed the administrative record in order to consider 
its "claims under the APA, challenging NCUA's rule and 
certain expansions on the ground that the agency's actions 
were 'arbitrary, capricious, an abuse of discretion, or other-
wise not in accordance with the law.' " Appellant's Opening 
Br. at 17 (quoting amended complaint). Having reviewed the 

amended complaint, however, we agree with the district court 
that the ABA's argument that the challenged provisions 
violate the FCUA can be resolved with nothing more than the 
statute and its legislative history. See Am. Bankers Ass'n v. 
Nat'l Credit Union Admin., 93 F. Supp. 2d 35, 48-49 (D.D.C. 
2000); see also Sierra Club v. United States Fish & Wildlife 
Serv., 245 F.3d 434, 440 n.37 (5th Cir. 2001) ("Although the 
administrative record for the regulation is not before this 
Court, that is of no moment. Our review is limited to 
interpreting the extent to which the regulation is consistent 
with the statute--a task which we are competent to perform 
without the administrative record.") (citing INS v. Cardoza-
Fonseca, 480 U.S. 421, 447 (1987)). Although the ABA now 
hints that it also asserted a challenge to the Administration's 
rule-making process, we can find no such claim in the amend-
ed complaint. Nor, and again contrary to what the ABA 
says, can we find any challenge to the manner in which the 
Administration has applied the rule in specific cases that does 
not depend entirely on the argument that the rule itself 
violates the statute. Should the ABA have concerns about 
the Administration's application of the rule to specific cases, it 
remains free to bring an as-applied challenge.

 Because the ABA argues that the provisions of the rule it 
challenges violate the FCUA, a statute the Administration is 
charged with enforcing, we proceed in accordance with Chev-
ron's familiar two-part test. See Chevron U.S.A., Inc. v. 
Natural Res. Def. Council, Inc., 467 U.S. 837 (1984). Al-
though Chevron step one analysis begins with the statute's 
text, we must not "confine [ourselves] to examining a particu-
lar statutory provision in isolation. The meaning--or ambi-
guity--of certain words or phrases may only become evident 
when placed in context." FDA v. Brown & Williamson 
Tobacco Corp., 529 U.S. 120, 132 (2000). We must also 
"exhaust the traditional tools of statutory construction," Nat-
ural Res. Def. Council, Inc. v. Browner, 57 F.3d 1122, 1125 
(D.C. Cir. 1995) (internal quotation marks and citation omit-
ted), including examining the statute's legislative history to 
"shed new light on congressional intent, notwithstanding stat-
utory language that appears superficially clear," id. at 1127 

(internal quotation marks and citation omitted). And, of 
course, "we must be guided to a degree by common sense as 
to the manner in which Congress is likely to delegate a policy 
decision ... to an administrative agency." Brown & Wil-
liamson, 529 U.S. at 121. If, applying these principles, we 
find that "Congress has directly spoken to the precise ques-
tion at issue ... that is the end of the matter; for the court, 
as well as the agency, must give effect to the unambiguously 
expressed intent of Congress." Chevron, 467 U.S. at 842-43.

 Only if we find the statute either silent or ambiguous with 
respect to "the precise question at issue" do we proceed to 
Chevron's second step, asking "whether the agency's answer 
is based on a permissible construction of the statute." Chev-
ron, 467 U.S. at 842-44. But not in this case. Although the 
district court resolved all issues on the basis of Chevron step 
two analysis, Am. Bankers, 93 F. Supp. 2d at 40, the ABA 
rests its appeal entirely on Chevron step one. Throughout its 
opening brief, the ABA uses only Chevron step one language: 
"the District Court misapplied Chevron ... by upholding 
actions that are contrary to the clearly expressed intent of 
Congress," Appellant's Opening Br. at 11; "the language of 
the FCUA expressly rejects NCUA's policy choice," id. at 26; 
"Congress makes plain," id.; "it is clear that Congress did 
not intend," id. at 28; "[the Administration] decided it could 
evade the plain meaning of [the statute]," id. at 29; "[the rule 
is unlawful] as a matter of simple English," id. at 35. More-
over, the brief never uses the word "unreasonable" nor any 
other language suggesting a Chevron step two argument. 
Even after the Administration and Intervenors responded 
with Chevron step one and two defenses, the ABA confined 
its reply brief to straightforward Chevron step one argu-
ments: "policy considerations cannot trump the clearly ex-
pressed intent of Congress," Appellant's Reply Br. at 7; "[the 
Administration's] argument is contrary to the plain lan-
guage," id. at 9; "Congress did express an intent," id. at 12; 
"there is no basis to believe that Congress's concern did not 
apply," id. at 14. Accordingly, we will evaluate the ABA's 
claims under Chevron step one standards alone.

 We begin with the ABA's challenge to the Administration's 
method for calculating the size of a common-bond group. 
Under the statute, the "membership field" of a multiple 
common-bond credit union is limited to groups comprised of 
persons sharing a common bond, 12 U.S.C. s 1759(b)(2), and 
"only a group with fewer than 3,000 members shall be eligible 
to be included in the field of membership category of a 
[multiple common-bond] credit union...." 12 U.S.C. 
s 1759(d)(1). Under the rule, the Administration counts only 
"primary potential members," 63 Fed. Reg. at 72,000, 72,002, 
i.e., persons sharing the occupational or associational bond 
that defines the group, toward the 3000-member limit. Al-
though "by virtue of their close relationship to a common-
bond group," certain other persons "may be included ... in 
the field of membership" of a common-bond credit union--
that is, they may join the credit union--such persons are not 
counted toward the 3000-member limit. Id. at 72,037. These 
persons include immediate family and household members of 
primary potential members, as well as pensioners and annui-
tants. Id. We consider each category in turn.

 Family Members

 Calling the rule's failure to count family members toward 
the 3000-member limit a "serious misreading of the Act," 
Appellant's Opening Br. at 21, the ABA argues that individu-
als are eligible to join a common-bond credit union only if 
they share the common bond. Therefore, the ABA claims, if 
family members are eligible for common-bond credit union 
membership, then they are necessarily group members and 
must be counted. The ABA also points out that subsection 
1759(c) contains two "[e]xceptions" to subsection (b), the 
"membership field" provision--one for "grandfathered mem-
bers and groups" and another for "underserved areas"--
neither of which pertains to family and household members. 
12 U.S.C. s 1759(c).

 The ABA focuses too narrowly. Subsection 1759(b) ex-
pressly states that it is "subject to the other provisions of 
[Section 1759]," 12 U.S.C. s 1759(b), and section 1759 con-

tains a provision relating to family and household members: 
the "Additional membership eligibility provisions," 12 U.S.C. 
s 1759(e). This subsection states:

 No individual shall be eligible for membership in a credit 
 union on the basis of the relationship of the individual to 
 another person who is eligible for membership in the 
 credit union, unless the individual is a member of the 
 immediate family or household ... of the other person.
 
12 U.S.C. s 1759(e)(1). Though phrased as a limitation, 
subsection 1759(e) links credit union membership eligibility 
for family and household members to the personal relation-
ship between such persons and group members (or other 
persons eligible for credit union membership), rather than to 
group membership. Moreover, the fact that this provision 
speaks of individuals' eligibility for credit union membership, 
while the 3000-member limit provision, 12 U.S.C. 
s 1759(d)(1), speaks of "group ... eligibil[ity] to be included 
in ... a [multiple common-bond] credit union," indicates that 
credit union members and group members do not entirely 
overlap. Under these circumstances, we have no basis for 
concluding that the FCUA unambiguously requires the Ad-
ministration to count family and household members toward 
the 3000-member limit.

 The ABA insists that "the history of the statute" supports 
its view that section 1759(e)(1) provides no basis for family 
and household credit union membership eligibility other than 
sharing the common bond. Appellant's Opening Br. at 21. 
Specifically, it argues that prior to the 1998 Amendments, the 
Administration treated family and household members as 
part of the common-bond group, and that in the district court 
the Administration conceded that Congress "merely 'endorsed 
the agency's longstanding policy' " regarding these persons. 
Appellant's Opening Br. at 21-22 (quoting Admin. Mem. In 
Supp. Motion to Dismiss at 51 (internal quotation marks and 
citation omitted)). Although the ABA cites some evidence 
that supports this characterization of the Administration's 
prior policy, see 44 Fed. Reg. 43,737, 43,739 (July 26, 1979) 
(proposed rule characterizing family members as "additional 

persons [who] ... share a common bond with the basic 
group") (cited in Appellant's Opening Br. at 21-22), other 
evidence indicates that the matter is not so clear. For 
example, a 1994 Final Interpretive Ruling and Policy State-
ment describes family members as "secondary or derivative" 
members included in the field of membership "by virtue of 
their close relationship to a common bond group." 59 Fed. 
Reg. 29,066, 29, 093 (June 3, 1994) (cited in Intervenors' Br. 
at 13 n.6). Such conflicting evidence cannot clarify ambigu-
ous statutory language. See Ayuda, Inc. v. Thornburgh, 880 
F.2d 1325, 1345 (D.C. Cir. 1989) ("[E]ither the plain language 
of the statute must be clear, or the legislative history and 
design of the act must illustrate a specific intent despite 
arguably ambiguous statutory language.") (citations omitted), 
vacated on other grounds, 498 U.S. 1117 (1991).

 Pensioners

 Unlike the FCUA's express provision for family and house-
hold members, the statute never mentions pensioners or 
annuitants. According to the ABA, this silence means that its 
argument that anyone eligible for multiple common-bond 
credit union membership must be counted toward the 3000-
member limit applies even more forcefully in the case of 
pensioners. The district court concluded that the ABA had 
failed to raise this claim because the amended complaint 
mentions only family and household members in the relevant 
count. Am. Bankers, 93 F. Supp. 2d at 41 n.3. We agree.

 In its original complaint, the ABA made only one allegation 
with respect to the Administration's method for calculating 
common-bond group size: that the rule unlawfully fails to 
count family and household members. See Complaint p p 40-
42. The complaint never mentioned pensioners. In its 
amended complaint, the ABA continues to focus on family 
members, although pensioners are mentioned. The amended 
complaint describes how the rule permits certain persons 
whom the Administration does not count as group members--
"persons in the immediate families or households of the credit 
unions [sic] members; pensioners and annuitants of a quali-

fied business; spouses of persons who died when in the credit 
union's field of membership; and employees of the credit 
union"--to be eligible for credit union membership, Amended 
Complaint p 24, and alleges that "if the persons listed in [this] 
section of the rule ... do not share the common bond, then 
they cannot be eligible for membership in a common-bond 
credit union," id. p 28. The amended complaint further alleg-
es that the Administration's approval of a certain credit 
union's application to add an occupational common-bond 
group violated the statute because the Administration failed 
to count "members of the employees' immediate families, 
persons [who] retired as pensioners or annuitants ... and 
[s]pouses of persons who died" as group members. Id. p 27 
(internal quotation marks omitted). Like the original com-
plaint, however, the amended complaint challenges only the 
failure to count family and household members. For exam-
ple, immediately after describing the rule's failure to count 
pensioners and annuitants, among others, the amended com-
plaint alleges that the rule is unlawful because it "excludes 
family members" and "counts only ... primary members." 
Id. p p 25, 26 (internal quotation marks omitted). Likewise, 
Count One objects to the rule's failure to count "certain 
members of the common bond, including family and house-
hold members," id. p 69; neither Count One nor any of the 
other sixteen counts mentions pensioners. Under these cir-
cumstances, we doubt the Administration could have known 
that the ABA intended to challenge the rule's application to 
pensioners and annuitants. See Fed. R. Civ. P. 8(a)(2); 
Conley v. Gibson, 355 U.S. 41, 47 (1957) (setting forth notice 
pleading rule).

 III.

 The FCUA's grandfather clause provides: "(i) any person 
or organization that is a member of any Federal credit union 
as of August 7, 1998 may remain a member of the credit 
union after August 7, 1998"; and "(ii) a member of any group 
whose members constituted a portion of the membership of 
any Federal credit union as of August 7, 1998 shall continue 
to be eligible to become a member of that credit union, by 

virtue of membership in that group after August 7, 1998." 12 
U.S.C. s 1759(c)(1)(A)(i) and (ii). The Administration inter-
prets the grandfather clause to permit persons who are 
members of a group that was part of a credit union as of 
August 7, 1998, the date the 1998 Amendments were enacted, 
to join the credit union even if they didn't become group 
members until after that date. See 63 Fed. Reg. at 72,015 
(grandfather provision applies to "a member, or subsequent 
new member, of any group, whose membership constituted a 
portion of the membership of any federal credit union at the 
date of enactment"). Disagreeing, the ABA argues that the 
clause's plain language permits only persons who were group 
members as of August 7, 1998, to join because only they could 
"continue to be eligible" to become credit union members. 12 
U.S.C. s 1759(c)(1)(A)(ii).

 The ABA's interpretation is certainly plausible. But when 
we read the grandfather clause in its entirety, as we must, see 
Brown and Williamson, 529 U.S. at 120 (noting that statuto-
ry words and phrases should be read in context), its meaning 
is not so clear. The grandfather clause's first part--referring 
to "a member of any group whose members constituted a 
portion of the membership of any Federal credit union as of 
August 7, 1998," 12 U.S.C. s 1759(c)(1)(A)(ii)--suggests, as 
the Administration argues, that its scope turns not on wheth-
er the individual was a group member as of August 7, 1998, 
but on whether the group was part of a credit union as of that 
date. Indeed, if individuals needed to be group members on 
the date the FCUA was amended, the phrase "as of August 7, 
1998" would follow the words "a member of any group."

 According to the ABA, the Administration's interpretation 
of the grandfather clause "has the effect of reading the word 
'continue' out of the statute." Appellant's Reply Br. at 16. 
We disagree. The Administration plausibly interprets this 
word to refer to any member of a group that was part of a 
credit union as of August 7, 1998. To use the statute's 
language, if a group's "members constituted a portion of the 
membership of any federal credit union as of August 7, 1998," 
12 U.S.C. s 1759(c)(1)(A)(ii), then the group's members, 

whether they became members before or after August 7, 
1998, shall "continue" to be eligible for credit union member-
ship.

 Faced with two plausible interpretations of the grandfather 
clause, we may examine its legislative history, see Browner, 
57 F.3d at 1126-29 (considering legislative history at Chevron 
step one), and that history definitively resolves the debate 
over the grandfather clause's meaning in the Administration's 
favor. The House Report explains that the "broad grandfa-
ther" clause "covers all persons or organizations or successors 
who were members of a federal credit union on the date of 
enactment of this Act, as well as anyone who is or becomes a 
member of a group representing a portion of the credit 
union's membership," H.R. Rep. No. 105-472, at 19 (1998), 
and "[the provision] grandfathers all current members as well 
as current groups contained within the membership of a 
credit union as of the date of enactment of this legislation. 
The grandfather [provision] will permit such groups to contin-
ue accepting new members," id. at 11. The Senate Report 
makes the same point, stating that the clause includes "all 
current members as well as current groups.... The grand-
father provision also permits such groups to continue adding 
new members." S. Rep. No. 105-193, at 3-4 (1998). As the 
district court put it, this legislative history is "pellucid" on the 
issue. Am. Bankers Ass'n v. Nat'l Credit Union Admin., 38 
F. Supp. 2d 114, 134 (D.D.C. 1999).

 IV.

 The ABA's next challenge focuses on the FCUA's require-
ment that in order for a group to be added to a credit union, 
the group must be within "reasonable proximity" of that 
credit union. 12 U.S.C. s 1759(f)(1)(B). The rule defines 
"reasonable proximity" as "within the service area of a service 
facility of the credit union." 63 Fed. Reg. at 72,002. Al-
though the rule defines a "service facility" as "a credit union 
owned electronic facility" at which the credit union member is 
"able to deposit funds, apply for a loan, and obtain funds on 
approved loans," the rule "excludes ... ATMs." Id. at 
72,003. Claiming that an "electronic facility" is similar to an 

ATM, and that the legislative history of the 1998 Amend-
ments shows that "Congress did not intend for devices similar 
to ATMs to be considered 'service facilities,' " Appellant's 
Opening Br. at 37, the ABA argues that the Administration's 
definition violates the statute. Defending its rule, the Admin-
istration argues that the legislative history deals with the 
term "facility" in the context of a different statutory provi-
sion, that Chevron step two applies because the FCUA no-
where defines "reasonable proximity," and that the agency's 
interpretation is reasonable.

 Although the parties obviously feel strongly about this 
issue--they devoted nine pages of briefing to it--not one has 
identified an "electronic facility" that is not also an ATM. 
The rule doesn't define "electronic facility"; the briefs never 
define it; and when asked at oral argument, neither counsel 
could define it, much less tell us whether non-ATM electronic 
facilities even exist. Under these circumstances, this issue is 
plainly unripe for judicial review. See Abbott Labs. v. Gard-
ner, 387 U.S. 136, 148-49 (1967) (ripeness requires that issue 
be fit for judicial decision); Louisiana Envtl. Action Network 
v. United States Envtl. Prot. Agency, 172 F.3d 65, 69 (D.C. 
Cir. 1999) (issue not fit for judicial decision where its "[c]on-
sideration ... would benefit from a more concrete setting").

 V.

 The ABA raises several other challenges to the rule's 
provisions governing multiple common-bond credit unions. 
None has merit.

 First, the ABA argues that the Administration's criteria for 
determining when a group with 3000 or more members "could 
not feasibly or reasonably establish a new single common-
bond credit union," 12 U.S.C. s 1759(d)(2)(A), and may there-
fore join an existing credit union, violate the FCUA because 
the Administration considers the group's "desire and intent" 
to be "[i]mportant" and "key" in this analysis, 63 Fed. Reg. at 
72,002, 72,010. According to the ABA, the statutory phrase 
"feasibly or reasonably" requires the Administration to deter-
mine independently whether the group could operate its own 

credit union, but the rule "essentially ... allows the group 
itself to decide whether it will be allowed to join an existing 
credit union." Appellant's Opening Br. at 25. The rule 
specifies, however, that "the intent of the group ... [is] not 
the sole factor[ ]. The final decision must be based on an 
independent regulatory analysis in consideration of the re-
maining factors in the regulation." 63 Fed. Reg. at 72,002 
(emphasis added). Those remaining factors include "the vol-
unteers and resources to support the efficient and effective 
operations of the credit union, whether the group meets the 
economic advisability criteria and the demographics of the 
group." Id. at 72,010.

 Second, the ABA challenges the portion of the rule that 
permits voluntary mergers between healthy multiple com-
mon-bond credit unions comprised of groups with fewer than 
3000 members "without regard to the statutory requirements 
for non-affiliated groups of [this size] ... seeking to join an 
existing credit union." 63 Fed. Reg. at 72,003. These re-
quirements, which apply to multiple common-bond credit 
union "expansions," include a provision directing the Adminis-
tration to "encourage the formation of separately chartered 
credit unions," the "reasonable proximity" requirement, and 
the "approval criteria" for credit unions seeking to include 
new groups. 12 U.S.C. s 1759(f). The ABA argues that 
these requirements "apply on their face whenever a credit 
union seeks to expand its field of membership by adding new 
groups--including when it does so through merger." Appel-
lant's Opening Br. at 30. This argument suffers from an 
obvious defect: Several of the requirements set forth in the 
"expansions" subsection make no sense in the case of merg-
ers. For example, how can the Administration "encourage 
the formation of separate credit unions," since mergers, by 
definition, bring together already-formed credit unions? Or 
why would Congress have written the "approval criteria" in 
the singular--"the credit union has not engaged in any unsafe 
or unsound practice," "is adequately capitalized," and "has the 
administrative capability ... and the financial resources ... 
to serve the new membership group," 12 U.S.C. 
s 1759(f)(2)--if it had intended them to apply to mergers of 

two credit unions? Contrary to the ABA's argument, there-
fore, subsection 1759(f) does not unambiguously apply to 
mergers.

 Third, the ABA challenges the requirement that groups 
with fewer than 3000 members "demonstrate why they can 
successfully operate a credit union" in order to obtain a 
separate charter. 63 Fed. Reg. at 72,001. According to the 
ABA, this provision violates the FCUA's requirement that the 
Administration "encourage the formation of separately char-
tered credit unions." 12 U.S.C. s 1759(f)(1)(A). Yet the 
statute only requires the Administration to encourage groups 
to form their own credit unions "whenever practicable and 
consistent with reasonable standards for the safe and sound 
operation of the credit union." Id. Requiring that smaller 
groups show they can operate their own credit unions safely 
is entirely consistent with this requirement.

 VI.

 We turn finally to the ABA's challenges to the Administra-
tion's approach to the chartering of community credit unions. 
Pointing out that Congress added the word "local" to the 
"well-defined community, neighborhood, or rural district" 
community credit union definition, the ABA argues that al-
though Congress intended the Administration to take a more 
restricted approach to community credit union charters, the 
new rule is either the same as, or in some instances, less 
restrictive than, the prior rule. In support of this proposi-
tion, the ABA cites two provisions of the rule: the criteria for 
determining whether a community qualifies for a charter, 
see 63 Fed. Reg. at 72,038, and the new 34presumptive community34
standard applicable to a recognized political jurisdiction with no more than 
300,000 residents, or multiple contiguous political jurisdictions with no more 
than 200,000 residents, see 63 Fed. Reg. at 72,013, 72,037-38. The ABA 
contends that the community credit union criteria are substantially unchanged. 
Compare 63 Fed. Reg. at 72,038 (new rule listing political jurisdictions, 
major trade areas, shared/common facilities, organiza-
tions/clubs, newspapers/other periodicals, maps designating 
community to be served, common characteristics and back-
ground of residents, and other documentation demonstrating 
common interests or interaction) with 59 Fed. Reg. at 29,077 
(former rule listing political jurisdictions, major trade areas, 
shared/common facilities, organizations/clubs, newspa-

pers/other periodicals, census tracts, common 
characteristics and background of residents, history of area, and other evidence of what 
distinguishes chosen area and its residents). 
The ABA also points out that an area benefitting from the 
"presumptive community" standard is sub-
ject to less demanding documentation requirements than 
ordinarily apply to an area seeking a credit union charter.
See 63 Fed. Reg. at 72,013, 72,037-38.

 Keeping in mind that the ABA limits this appeal to Chev-
ron step one, we have little difficulty rejecting these arguments. 
To begin with, the Administration acknowledges in the rule 
itself that the addition of the word "local" reflects congres-
sional intent that it take "a more circumspect and restricted 
approach to chartering community credit unions." 63 Fed. 
Reg. at 72,012. Moreover, although the Administration left 
the community credit union criteria substantially unchanged, 
it has made clear that it intends to apply them more strin-
gently. Specifically, where a community tests the limits of 
the statutory standard, the Administration will require it "to 
demonstrate more definitively how it meets the local require-
ment." Id. at 72,012; see also id. at 72,037-38 (more docu-
mentation required for larger or more densely populated 
areas). And although the Administration adopted a new 
presumption, the rule not only requires documentation "de-
scribing how the area meets the standards for community 
interaction or common interests," but also makes clear that 
the Administration reserves the right to request additional 
evidence of community interaction or common interests when 
the community's initial submission falls short. See id. at 
72,038. At least on its face, therefore, the rule adopts a more 
circumspect method for applying the community credit union 
criteria.

 The ABA also argues that because the rule provides that 
the Administration will consider an area's "primary ethnic 
composition" in determining whether it qualifies as a "well-
defined local community," 63 Fed. Reg. at 72,038, the rule 
violates the Fifth Amendment, the FCUA, and the Equal 

Credit Opportunity Act, 15 U.S.C. s 1691(a)(3). The district 
court dismissed this claim, concluding that the ABA, having 
failed to allege injury to itself, lacked Article III standing. In 
the alternative, the court held that the consideration of eth-
nicity in the chartering process violates none of the cited 
statutory or constitutional provisions. See Am. Bankers, 93 
F. Supp. 2d at 48. The Administration argues that this issue 
has now become moot because it deleted the ethnicity provi-
sion from the rule during the pendency of this appeal. Com-
pare 63 Fed. Reg. at 72,038 (final rule) with 66 Fed. Reg. 
15,619, 15,620 (March 20, 2001) (amending final rule). Al-
though the ABA insists that we should nonetheless "declare 
[the] policy unlawful to prevent the [Administration] from 
returning to it," Appellant's Reply Br. at 21, we think the 
Administration has met its burden to show mootness: It has 
eliminated the allegedly unlawful provision and "there is no 
indication [it] will revert to its past [policy]." Arizona Pub. 
Serv. Co. v. EPA, 211 F.3d 1280, 1295-96 (D.C. Cir. 2000) 
(holding that challenge to EPA rule was moot where agency 
issued clarification modifying challenged provision); see Nat'l 
Mining Ass'n v. United States Dep't of Interior, 251 F.3d 
1007, 1011 (D.C. Cir. 2001) (holding that challenge to National 
Mining Association regulations was moot where agency 
adopted new regulations eliminating challenged provisions); 
Motor & Equip. Mfrs. Ass'n v. Nichols, 142 F.3d 449, 458-59 
(D.C. Cir. 1998) (holding that EPA met " 'heavy' burden" to 
show that challenge to EPA waiver for state regulatory 
program was moot to extent state had eliminated allegedly 
unlawful regulations) (quoting County of Los Angeles v. 
Davis, 440 U.S. 625, 631 (1979)).

 VII.

 The ABA's challenge to the "reasonable proximity" require-
ment is dismissed as unripe. Its challenge to the ethnicity 
provision is dismissed as moot. In all other respects, the 
decision of the district court is affirmed.

 So ordered.