148 T.C. No. 10

UNITED STATES TAX COURT

GOOD FORTUNE SHIPPING SA, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25327-12.                    Filed March 28, 2017.

P, a foreign corporation organized under the laws of the Republic of the Marshall Islands, issued its stock shares in bearer form. In Form 1120-F, U.S. Income Tax Return for a Foreign Corporation, that it filed for its taxable year 2007, P claimed that it is not described in I.R.C. sec. 883(c)(1) and that therefore it is entitled under I.R.C. sec. 883(a)(1) to exclude from gross income and exempt from U.S. taxation certain income. P made that claim even though certain regulations under I.R.C. sec. 883 that were applicable for P's taxable year 2007 (bearer share regulations) precluded a foreign corporation the shares of which were issued in bearer form from taking such shares into account in establishing the ownership of the stock of the foreign corporation for purposes of determining whether the foreign corporation is described in I.R.C. sec. 883(c)(1) and thus whether it is entitled to the benefits of I.R.C. sec. 883(a)(1). It is P's position that the bearer share regulations are invalid. The parties agree that we are required to follow the bearer share regulations unless we hold that those regulations are invalid under the two-step analysis that the Supreme Court of the United States prescribed in <u>Chevron U.S.A.,</u>

Inc. v. Nat. Res. Def. Council, Inc. (Chevron), 467 U.S. 837 (1984). P concedes that if we were to hold that the bearer share regulations are valid, it is not entitled under I.R.C. sec. 883(a)(1) for its taxable year 2007 to exclude from gross income or exempt from U.S. taxation certain income.

Held: I.R.C. sec. 883(c)(1) as well as its legislative history is silent--there is a gap in that section as well as its legislative history--as to how ownership by individuals of a foreign corporation may be established for purposes of determining whether the foreign corporation is described in I.R.C. sec. 883(c)(1) and thus whether it is entitled to the benefits of I.R.C. sec. 883(a)(1). Consequently, the Secretary of the Treasury (Treasury Secretary) was authorized under Chevron to fill that gap by promulgating regulations. See Chevron, 467 U.S. at 842-843.

Held, further, the Treasury Secretary did not act unreasonably, arbitrarily, or capriciously or in violation of I.R.C. sec. 883(c)(1) or its legislative history when the Treasury Secretary interpreted that section in the bearer share regulations in a way that precluded a foreign corporation the shares of which were issued in bearer form from taking such shares into account in establishing the ownership of the stock of the foreign corporation for purposes of determining whether the foreign corporation is described in I.R.C. sec. 883(c)(1) and thus whether it is entitled to the benefits of I.R.C. sec. 883(a)(1). See Chevron, 467 U.S. at 844.

Held, further, the bearer share regulations are valid under the two-step analysis under Chevron.

Stephen P. Flott and Joseph G. Siegmann, for petitioner.

Lisa M. Rodriguez, Carmen N. Presinal-Roberts, and Patricia Young Taylor, for respondent.

OPINION

CHIECHI, <u>Judge</u>:  This case is before us on respondent's motion for summary judgment (respondent's motion) and petitioner's motion for partial summary judgment (petitioner's motion).  We will grant respondent's motion and will deny petitioner's motion.

The parties stipulated all of the facts for purposes of their respective motions.[1]  We conclude that there is no genuine dispute as to any fact that is material to our resolving the ultimate issue and the underlying questions in those motions.

The ultimate issue for petitioner's taxable year 2007 in petitioner's motion is whether, as petitioner maintains, certain regulations under section 883[2] are invalid.  The ultimate issue for petitioner's taxable year 2007 in respondent's motion is whether, as respondent maintains, petitioner is not entitled under section

---

[1]We will not set forth a separate statement of background facts but will state throughout our Opinion those background facts that are material, relevant, and/or helpful to understanding and resolving the ultimate issue and questions presented in the parties' respective motions.

[2]All section references are to the Internal Revenue Code (Code) in effect for petitioner's taxable year 2007, the year at issue.  Unless otherwise indicated, all references to the regulations under sec. 883 are to the Income Tax Regulations applicable for that taxable year of petitioner.

883(a)(1) for that year to an exclusion from gross income and an exemption from taxation by the United States (U.S. taxation) of certain gross income described in that section. In advancing respondent's position in respondent's motion, respondent assumes that certain regulations under section 883, the validity of which petitioner challenges in petitioner's motion, are valid. Petitioner concedes that if we were to hold that those regulations are valid, it will not be entitled for its taxable year 2007 to the benefits of section 883(a)(1). Thus, the ultimate issue that we must decide in considering whether to grant petitioner's motion or to grant respondent's motion is whether certain regulations under section 883 are invalid, as petitioner maintains, or valid, as respondent maintains.

The regulations under section 883 the validity of which petitioner places at issue prescribe certain rules for petitioner's taxable year 2007 for determining how to establish the ownership of the stock of a foreign corporation, like petitioner, the stock shares of which were issued in bearer form for purposes of ascertaining whether the foreign corporation is described in section 883(c)(1) and thus whether it is entitled under section 883(a)(1) to an exclusion from gross income and an exemption from U.S. taxation of certain gross income described in that section.

Before addressing the issue of the validity of those regulations and the underlying questions relating to that issue, we first summarize the pertinent

statutory and regulatory framework in which that issue and those questions arise.[3]

We next describe the factual framework in which the issue of the validity of the

regulations under section 883 and the underlying questions relating to that issue

arise.

We turn initially to the pertinent statutory framework. In the case of a

foreign corporation, section 887(a) imposes for each taxable year a tax equal to

4% of the foreign corporation's U.S. source gross transportation income

(USSGTI) for each such year. Section 883(a)(1) excludes from the gross income

of a foreign corporation and exempts from U.S. taxation gross income from the

international operation of ships derived by the foreign corporation if the foreign

country in which the corporation is organized grants an equivalent exemption to

corporations organized in the United States (U.S. corporations). Section 883(c)(1)

provides that the exclusion from gross income and the exemption from U.S.

taxation that section 883(a)(1) allows will not apply to a foreign corporation that

derives gross income from the international operation of ships if 50% or more of

the value of its stock is owned, directly or indirectly through the application of

---

[3]Unless helpful in understanding the statutory and regulatory provisions that are pertinent and/or applicable here, we do not summarize any statutory or regulatory provisions that the parties agree, and we conclude, are not pertinent or applicable here.

certain attribution rules in section 883(c)(4), by individuals who are not residents of a foreign country that grants an equivalent exemption to U.S. corporations.

The pertinent statutory provisions in sections 887 and 883(a) and (c) that we just summarized became law when Congress added section 887 to the Code and amended section 883 in the Tax Reform Act of 1986 (1986 Act), Pub. L. No. 99-514, sec. 1212(b) and (c)(3)-(5), 100 Stat. at 2537-2539.[4]  Before the addition to the Code of section 887, the United States did not, in contrast to a number of other countries, impose a gross basis tax on domestic source shipping income of foreign persons.  See H.R. Conf. Rept. No. 99-841 (Vol. II), at II-597, 1986-3 C.B. (Vol. 4) 1, 597.

Before the amendments to section 883 that Congress made in the 1986 Act, which was and is still known as the reciprocal exemption provision, the United States did not tax the earnings of foreign persons from the operation of ships and aircraft registered in foreign countries that granted equivalent exemptions to U.S.

---

[4]The Tax Reform Act of 1986 (1986 Act), Pub. L. No. 99-514, sec. 1212, 100 Stat. at 2536, as applicable here, was thereafter amended by Congress in the Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, sec. 1012(e)(1), (2)(A), and (5), 102 Stat. at 3499-3500, and in the Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, sec. 7811(i)(8)(D), and (10), 103 Stat. at 2411.  Those amendments do not affect our resolution of the issue of the validity of certain regulations under sec. 883 that petitioner is challenging in petitioner's motion.  (For convenience, we refer only to the 1986 Act changes that Congress made to sec. 883.)

citizens and U.S. corporations. The reasons for those amendments in the 1986

Act, as set forth in the report of the Committee on Finance of the U.S. Senate,

included the following:

> Currently, the reciprocal exemption provisions eliminate U.S. tax on foreign persons (even U.S.-controlled foreign corporations) by allowing exemptions based on country of documentation or registry, without regard to the residence of persons receiving the exemption or whether commerce is conducted in that country. This places U.S. persons with U.S.-based transportation operations and subject to U.S. tax at a competitive disadvantage vis-a-vis their foreign counterparts who claim exemption from U.S. tax and who are not taxed in their countries of residence or where the ships are registered. * * *

S. Rept. No. 99-313 (1986), 1986-3 C.B. (Vol. 3) 1, 340.

The pertinent provisions of section 883 after the amendments to that section

that Congress made in the 1986 Act

> provide[] that a foreign corporation organized in a country that exempts U.S. citizens and domestic corporations from tax on shipping income will be exempt from U.S. tax on shipping income, notwith-standing that third country residents have interests in the corporation, provided at least 50 percent of its value is beneficially owned by individuals that reside in countries which have reciprocal tax exemp-tions with the United States. * * *

H.R. Conf. Rept. No. 99-841, supra at II-599, 1986-3 C.B. (Vol. 4) at 599.

We turn next to the pertinent regulatory framework.[5] The regulations under section 883 refer to a foreign corporation certain income of which qualifies for the exclusion from gross income and the exemption from U.S. taxation under section 883(a)(1) as a qualified foreign corporation. The term "qualified foreign corporation" is defined in section 1.883-1(c), Income Tax Regs. That definition requires, inter alia, that the foreign corporation meet the stock ownership test set forth in section 1.883-4, Income Tax Regs., which the regulations under section 883 refer to as the qualified shareholder stock ownership test. See sec. 1.883-1(c)(2), Income Tax Regs. Section 1.883-4(a), Income Tax Regs., provides that a foreign corporation satisfies the qualified shareholder stock ownership test if for at least one-half of the number of days during the tax year 50% or more of the value of its outstanding stock is owned, directly or indirectly through the application of the attribution rules in section 1.883-4(c), Income Tax Regs., by one or more qualified shareholders, as defined in section 1.883-4(b), Income Tax Regs. Section 1.883-4(a), Income Tax Regs., provides that a foreign corporation will not be treated as satisfying the stock ownership test set forth in section 1.883-1(c)(2), Income Tax

---

[5]Our summary of the pertinent regulatory framework does not include a summary of the regulations under sec. 883 the validity of which petitioner disputes. We summarize those disputed regulations after we have appropriately framed the ultimate issue that we must resolve.

Regs., by meeting the qualified shareholder stock ownership test set forth in section 1.883-4, Income Tax Regs., unless the foreign corporation meets the substantiation and reporting requirements set forth in section 1.883-4(d) and (e), Income Tax Regs.

We turn next to the factual framework. Petitioner is a corporation organized in 2002 under the laws of the Republic of the Marshall Islands (Marshall Islands). From its incorporation through December 31, 2007, petitioner had outstanding 500 authorized shares of stock that, pursuant to the applicable laws of the Marshall Islands, see 52 Marshall Islands Revised Code (MIRC), Associations Law, pt. 1, div. 5, sec. 42(2) (2004), it chose to issue in bearer form, and not in registered form.[6] During 2007, petitioner did not maintain a stock register, a ledger showing

---

[6]Tit. 52 Marshall Islands Revised Code (MIRC), Associations Law, pt. 1, div. 5, sec. 42(2) (2004), provides:

(2) Registered or bearer shares. Shares may be issued either in registered form or in bearer form provided that the articles of incorporation prescribe the manner in which any required notice is to be given to shareholders of bearer shares in conformity with section 11 of this Act; provided, however, that resident domestic corporations shall not be allowed to issues shares in bearer form. The transfer of bearer shares shall be by delivery of the certificates. The articles of incorporation may provide that on request of a shareholder his bearer shares shall be exchanged for registered shares or his registered shares exchanged for bearer shares.

(continued...)

the name(s) of its owner(s), or a stock transfer book. Nor did petitioner maintain during 2007 an immobilized book-entry system in which evidence of the ownership of its shares was maintained (1) in its books and records or (2) by a broker or financial institution.

Petitioner filed Form 1120-F, U.S. Income Tax Return of a Foreign Corporation, for its taxable year 2007 (2007 Form 1120-F). In that form, petitioner reported USSGTI of $4,093,375 and claimed under section 883(a)(1) an exclusion from gross income and an exemption from U.S. taxation of that reported amount of USSGTI.[7] In support of that claimed exclusion and exemption, petitioner included a schedule with its 2007 Form 1120-F. In that schedule, petitioner indicated, inter alia, that during its taxable year 2007 "[t]he total number of qualified shareholders as defined in Treasury Regulations §1.883-4(b)(1)" was

_____

[6](...continued)
Petitioner is not a resident domestic corporation for purposes of the Marshall Islands Association Law.

[7]In the notice of deficiency that respondent issued to petitioner for its taxable year 2007, respondent determined that the USSGTI of $4,093,375 that petitioner reported and the exclusion from income and the exemption from U.S. taxation of the same amount that it claimed in its 2007 Form 1120-F should be reduced to $3,587,375. Petitioner does not dispute that the amount of its USSGTI for its taxable year 2007 is the amount that respondent determined in the notice. Moreover, the parties agree that for petitioner's taxable year 2007 its USSGTI of $3,587,375 is the amount of its gross income described in sec. 883(a)(1).

two, that those two qualified shareholders' country of residence was Greece, and that "[t]he total percentage of the value of the outstanding shares in the corporation [that they] owned, applying the attribution rules of Treasury Regulation § 1.883-4(c)," was 100%.

Petitioner also included with its 2007 Form 1120-F Form 8275-R, Regulation Disclosure Statement (Form 8275-R), in which it challenged the validity of certain regulations under section 883 that disregard ownership through bearer shares of a foreign corporation seeking to qualify for the exclusion from gross income and the exemption from U.S. taxation under section 883(a)(1). In support of that challenge, petitioner asserted in pertinent part in Form 8275-R: "The per se disqualification, the denial of attribution, and the requirement to affirm whether or not ownership is held through bearer shares all fail the test of enforceability under the doctrine enunciated in Chevron USA, Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). * * * As a result, none of these provisions are [sic] valid or enforceable."

Good Fortune Holding SA (Good Fortune Holding) is a corporation organized under the laws of the Marshall Islands. From January 1 through December 31, 2007, 100% of the outstanding authorized stock shares that Good Fortune Holding had issued were in bearer form.

Good Luck Shipping SA (Good Luck Shipping) is a corporation organized under the laws of the Marshall Islands. From January 1 through December 31, 2007, 100% of the outstanding authorized stock shares that Good Luck Shipping had issued were in bearer form.

During respondent's examination of petitioner's 2007 Form 1120-F, petitioner provided respondent with copies of two documents titled "Intermediary Ownership Statement pursuant to US Treasury Regulation §1.883-4(d)(4)(i)".[8]

---

[8]Pursuant to sec. 1.883-4(d)(2)(i)(A) and (B), Income Tax Regs., an intermediary ownership statement, like the two that petitioner provided to respondent, and a qualified shareholder ownership statement, like the two that petitioner also provided to respondent, are required to be completed in order for a shareholder of a foreign corporation to be treated as a qualified shareholder of that corporation. A qualified shareholder ownership statement must be completed by any person claiming to be a qualified shareholder. An intermediary ownership statement must be completed by any intermediary in the chain of ownership between any such claimed qualified shareholder and the foreign corporation seeking qualified foreign corporation status. See id. In order for any such claimed qualified shareholder to be treated as a qualified shareholder, inter alia, the foreign corporation seeking qualified foreign corporation status must obtain the qualified shareholder ownership statement and the intermediate ownership statement required by sec. 1.883-4(d)(2)(i)(A) and (B), Income Tax Regs. See sec. 1.883-4(d)(2)(i)(C), Income Tax Regs. Pursuant to sec. 1.883-4(d)(2)(ii), Income Tax Regs., the qualified shareholder ownership statement and the intermediate ownership statement are valid until the earlier of the last day of the third calendar year following the year in which each of those statements is signed or the day on which a change of circumstance occurs that makes the information in any such ownership statement incorrect. All of the ownership statements that petitioner provided to respondent were signed in February 2005, and there was no change of circumstance as described in sec. 1.883-4(d)(2)(ii), Income Tax Regs.

One of those documents had been completed on behalf of Good Fortune Holding (Good Fortune Holding's intermediate ownership statement). It was dated February 26, 2008, signed under penalties of perjury by Maria Meseti on behalf of and as the sole director of Good Fortune Holding, and indicated that the "first tax year to which this statement applies * * * [is] 2005".[9] Good Fortune Holding's intermediate ownership statement stated in pertinent part as follows:

> Good Fortune Holding SA owned 100% of the capital stock of Good Fortune Shipping SA that was issued and outstanding as of the end of the tax year or years to which this statement applies. Good Fortune Shipping SA had only one class of authorized stock, called ordinary shares, during the tax year or years to which this statement applies. Good Fortune Holding SA owned the shares referenced above for more than half of the days of the tax year or years to which this statement applies.

The other document titled "Intermediary Ownership Statement pursuant to US Treasury Regulation §1.883-4(d)(4)(i)" that petitioner provided to respondent during respondent's examination of its 2007 Form 1120-F had been completed on behalf of Good Luck Shipping SA (Good Luck Shipping's intermediate ownership statement). It was dated February 26, 2008, signed under penalties of perjury by Irene Georgiou on behalf of and as the sole director of Good Luck Shipping, and

---

[9]See supra note 8.

indicated that the "first tax year to which this statement applies * * * [is] 2005".[10] Good Luck Shipping's intermediate ownership statement stated in pertinent part as follows:

> Good Luck Shipping SA owned 100% of the capital stock of Good Fortune Holding SA that was issued and outstanding as of the end of the tax year or years to which this statement applies. Good Fortune Holding SA had only one class of authorized stock, called ordinary shares, during the tax year or years to which this statement applies. Good Luck Shipping SA owned the shares referenced above for more than half of the days of the tax year or years to which this statement applies.

During respondent's examination of petitioner's 2007 Form 1120-F, petitioner also provided respondent with copies of two documents titled "Qualified Shareholder Ownership Statement Pursuant to US Treasury Regulation". One of those documents was dated February 26, 2008, and signed under penalties of perjury by Andreas Stengos (Mr. Stengos' qualified shareholder ownership statement). In that statement, Andreas Stengos (Mr. Stengos) indicated that the "first tax year to which this statement applies * * * [is] 2005".[11] Mr. Stengos further stated in pertinent part as follows in Mr. Stengos' qualified shareholder ownership statement:

---

[10]See supra note 8.

[11]See supra note 8.

4.     Qualified Shareholder's Name: Andreas Stengos

\*          \*          \*          \*          \*          \*          \*

7.     Country in which Qualified Shareholder is fully liable to tax: Greece

8.     I was resident in Greece for more than half of the days of the tax year or years to which this statement applies.

9.     I owned an interest in Good Fortune Shipping SA, which is seeking qualified foreign corporation status, indirectly through the ownership of stock in Good Luck Shipping SA as described below.

10.    I owned 40% of the common shares of the capital stock of Good Luck Shipping SA that were issued and outstanding as of the end of the tax year or years to which this statement applies.  Good Luck Shipping SA has only one class of stock.

11.    Good Luck Shipping SA owned all of the common shares of the capital stock of Good Fortune Holding SA that were issued and outstanding as of the end of the tax year or years to which this statement applies.  Good Fortune Holding SA has only one class of stock.

12.    Good Fortune Holding SA owned 100% of the common shares of the capital stock of Good Fortune Shipping SA that were issued and outstanding as of the end of the tax year or years to which this Ownership Statement applies.  Good Fortune Shipping SA has only one class of stock.

13.    The chain of ownership through which I owned an interest in Good Fortune Shipping SA during the tax year or years to which this statement applies is described above.

14. Good Luck Shipping SA, and Good Fortune Holding SA owned the shares referenced above for more than half of the days of the tax year or years to which this statement applies.

\* \* \*

The other document titled "Qualified Shareholder Ownership Statement Pursuant to US Treasury Regulation" that petitioner provided to respondent during respondent's examination of its 2007 Form 1120-F was dated February 26, 2008, and signed under penalties of perjury by George Giouroukos (Mr. Giouroukos' qualified shareholder ownership statement ). In that statement, George Giouroukos (Mr. Giouroukos) indicated that the "first tax year to which this statement applies \* \* \* [is] 2005".[12] Mr. Giouroukos further stated in pertinent part as follows in Mr. Giouroukos' qualified shareholder ownership statement:

4. Qualified Shareholder's Name: George Giouroukos

\*        \*        \*        \*        \*        \*        \*

7. Country in which Qualified Shareholder is fully liable to tax: Greece

8. I was resident in Greece for more than half of the days of the tax year or years to which this statement applies.

9. I owned an interest in Good Fortune Shipping SA, which is seeking qualified foreign corporation status, indirectly through the ownership of stock in Good Luck Shipping SA as described below.

---

[12]See supra note 8.

10. I owned 40% of the common shares of the capital stock of Good Luck Shipping SA that were issued and outstanding as of the end of the tax year or years to which this statement applies. Good Luck Shipping SA has only one class of stock.

11. Good Luck Shipping SA owned all of the common shares of the capital stock of Good Fortune Holding SA that were issued and outstanding as of the end of the tax year or years to which this statement applies. Good Fortune Holding SA has only one class of stock.

12. Good Fortune Holding SA owned 100% of the common shares of the capital stock of Good Fortune Shipping SA that were issued and outstanding as of the end of the tax year or years to which this Ownership Statement applies. Good Fortune Shipping SA has only one class of stock.

13. The chain of ownership through which I owned an interest in Good Fortune Shipping SA during the tax year or years to which this statement applies is described above.

14. I, Good Luck Shipping SA, and Good Fortune Holding SA owned the shares referenced above for more than half of the days of the tax year or years to which this statement applies.
* * *

We consider now the ultimate issue and the underlying questions in the parties' respective motions. We note initially that both respondent and petitioner assert that the following regulations under section 883, the validity of which petitioner challenges, are applicable for petitioner's taxable year 2007: section 1.883-1T(c)(3)(i)(G), Temporary Income Tax Regs., 72 Fed. Reg. 34605 (June 25, 2007); section 1.883-4(b)(1)(ii), (c)(1), (d)(1), and (4)(i)(E), Income Tax Regs.;

and section 1.883-4T(d)(4)(i)(C) and (D), Temporary Income Tax Regs., 72 Fed. Reg. 34608 (June 25, 2007).

Although the final regulations that the parties cite and that petitioner argues are invalid do apply for petitioner's taxable year 2007, the temporary regulations that the parties cite and that petitioner argues are invalid do not. Those temporary regulations generally were effective as of June 25, 2007, but were applicable for any taxable year of a foreign corporation that began after that date.[13] See sec. 1.883-5T(d) and (e), Temporary Income Tax Regs., 72 Fed. Reg. 34609 (June 25, 2007). Petitioner's taxable year 2007, the year at issue, began on January 1, 2007, not after June 25, 2007.

The regulations that are applicable for petitioner's taxable year 2007 and that prescribe certain rules for purposes of section 883 with respect to ownership of a foreign corporation through bearer shares are section 1.883-4(b)(1)(ii), (c)(1), (d)(1), and (4)(i)(E), Income Tax Regs. (We shall refer to the regulations under section 883 that prescribe certain rules with respect to ownership of a foreign

---

[13]Pursuant to sec. 1.883-5T(d) and (e), Temporary Income Tax Regs., 72 Fed. Reg. 34609 (June 25, 2007), a taxpayer could have elected to apply only sec. 1.883-3T, Temporary Income Tax Regs., 72 Fed. Reg. 34607 (June 25, 2007), relating to the treatment of any controlled foreign corporation (CFC) for any open taxable years of the foreign corporation that began on or after December 31, 2004. Petitioner does not claim to be, and is not, a CFC.

corporation through bearer shares and that are applicable for petitioner's taxable year 2007 as the bearer share regulations.[14]) We set forth below what those bearer share regulations, the validity of which petitioner challenges, provide.

Section 1.883-4(b)(1)(ii), Income Tax Regs., provides that a shareholder is a qualified shareholder only if, inter alia, the shareholder does not own, directly or indirectly by applying the attribution rules of section 1.883-4 (c), Income Tax Regs., the shareholder's interest in the foreign corporation through bearer shares.

---

[14]The Department of the Treasury (Treasury Department) amended the bearer share regulations effective for taxable years that began after September 17, 2010 (2010 amended bearer share regulations). The parties agree that the 2010 amended bearer share regulations do not apply for petitioner's taxable year 2007 and that in any event petitioner's bearer shares outstanding during its taxable year 2007 did not satisfy those amended regulations. Pursuant to the 2010 amended bearer share regulations, a foreign corporation may take into account in determining whether it is described in sec. 883(c)(1) bearer shares that it issued which are maintained (1) in a dematerialized book-entry system in which the bearer shares are represented only by book entries and no physical certificates are issued or transferred or (2) in an immobilized book-entry system in which evidence of ownership is maintained on the books and records of the corporate issuer of the bearer shares or by a broker or other financial institution. See, e.g., secs. 1.883-1(c)(3)(i)(G), 1.883-4(b)(1)(ii), (c), Income Tax Regs. In amending the bearer share regulations in 2010, the Treasury Department explained that it did so because it understood that "it has become increasingly common for corporations (both publicly traded and privately held) to use a dematerialized or immobilized book-entry system for maintaining their registered and bearer shares. * * * [and] "[b]ecause these systems provide the ability to reliably identify the beneficial owner of [the] bearer shares". 75 Fed. Reg. 56860 (Sept. 17, 2010).

Section 1.883-4(c)(1), Income Tax Regs., provides that for purposes of the attribution rules of section 1.883-4(c), Income Tax Regs., "[n]o attribution will apply to an interest held directly or indirectly through bearer shares."

Section 1.883-4(d)(1), Income Tax Regs., provides that a corporation that relies on the stock ownership test of sections 1.883-1(c)(2) and 1.883-4, Income Tax Regs., must establish all the facts necessary to satisfy the Commissioner of Internal Revenue (Commissioner) that 50% or more of the value of its shares is owned, or treated as owned under the attribution rules of section 1.883-4(c), Income Tax Regs., by qualified shareholders. However, section 1.883-4(d)(1), Income Tax Regs., further provides: "A foreign corporation cannot meet this requirement with respect to any stock that is issued in bearer form. A shareholder that holds shares in the foreign corporation either directly or indirectly in bearer form cannot be a qualified shareholder."

Section 1.883-4(d)(4)(i)(E), Income Tax Regs., sets forth, inter alia, certain information that must appear in the required so-called ownership statement of any person claiming to be a qualified shareholder of a foreign corporation that seeks qualified foreign corporation status for purposes of section 883.[15] That regulation requires the person claiming to be a qualified shareholder of such a foreign

---

[15]See supra note 8.

corporation to indicate in the ownership statement whether that person's owner-

ship interest in that foreign corporation "is owned directly or indirectly through

bearer shares".

As is apparent from our discussion of pertinent regulations under section

883, including the bearer share regulations, and as petitioner correctly points out,

the effect of the bearer share regulations is that petitioner, a foreign corporation, is

precluded from even attempting to establish, let alone establishing, to the satisfac-

tion of respondent that for its taxable year 2007 its shareholders meet the qualified

shareholder stock ownership test in section 883(c)(1)[16] and the regulations

thereunder. Consequently, as is also apparent from our discussion of pertinent

regulations under section 883, including the bearer share regulations, and as

petitioner also correctly points out, petitioner is unable to establish to respondent's

satisfaction (1) that it is a qualified foreign corporation as defined in section

1.883-1(c), Income Tax Regs., and (2) that its USSGTI for its taxable year 2007 is

excludible from gross income and exempt from U.S. taxation under section 883(a).

---

[16]Petitioner claims that during its taxable year 2007 certain individuals owned its stock through certain entities, thereby implicating sec. 883(c)(4). For convenience, we shall generally refer only to the ownership rules under sec. 883(c)(1), which necessarily implicates sec. 883(c)(4) where stock of a foreign corporation is owned, as petitioner claims is the case with petitioner, indirectly through other entities.

The parties agree that those unfavorable results for petitioner occur only because all of its shares are owned directly and indirectly through bearer shares and the bearer share regulations interpret section 883(c)(1) in a way that precludes a foreign corporation the shares of which were issued in bearer form from taking such shares into account in establishing the ownership of the stock of the foreign corporation for purposes of determining whether the foreign corporation is described in section 883(c)(1) and thus whether it is entitled to the benefits of section 883(a)(1).

We address now whether the bearer share regulations are valid regulations. The parties agree that we are required to follow the bearer share regulations unless we hold that those regulations are invalid under the two-step analysis that the Supreme Court of the United States (Supreme Court) prescribed in Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc. (Chevron), 467 U.S. 837 (1984). See Mayo Found. for Med. Educ. & Research v. United States (Mayo

Found.), 562 U.S. 44, 54-58. (2011).[17] They disagree over the application of that two-step analysis to the undisputed facts here.

The first step of the two-step analysis under <u>Chevron</u> (sometimes, step one analysis) is to inquire "whether Congress has directly spoken to the precise question at issue." <u>Chevron</u>, 467 U.S. at 842. If it has and "[i]f the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Id.</u> at 842-843.

A court must begin the step one analysis with the text of the statute in question. The U.S. Court of Appeals for the District of Columbia Circuit, the court to which an appeal in this case would normally lie, clarified in <u>Am. Bankers Ass'n v. Nat'l Credit Union Admin.</u>, 271 F.3d 262, 267 (D.C. Cir. 2001), that

---

[17]Congress gave the Secretary of the Treasury (Treasury Secretary) in sec. 7805(a) the authority to prescribe "all needful rules and regulations for the enforcement of" the Internal Revenue Code. In <u>Mayo Found. for Med. Educ. & Research v. United States</u> (<u>Mayo Found.</u>), 562 U.S. 44, 55-58 (2011), the Supreme Court clarified that it is necessary to subject to the two-step analysis of <u>Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.</u> (<u>Chevron</u>), 467 U.S. 837 (1984), regulations, like the bearer share regulations at issue here, which the Treasury Secretary promulgated under the authority of sec. 7805(a) pursuant to so-called notice-and-comment procedures--a "'significant' sign", according to the Supreme Court, that those regulations are entitled to deference under <u>Chevron</u>. See <u>Mayo Found.</u>, 562 U.S. at 57-59. (For convenience, we sometimes use interchangeably the terms "Treasury Secretary" and "Treasury Department".)

> [a]lthough <u>Chevron</u> step one analysis begins with the statute's text, we must not "confine [ourselves] to examining a particular statutory provision in isolation. The meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." <u>FDA v. Brown & Williamson Tobacco Corp.</u>, 529 U.S. 120, 132, 120 S.Ct. 1291, 146 L. Ed.2d 121 (2000). We must also "exhaust the traditional tools of statutory construction," <u>Natural Res. Def. Council, Inc. v. Browner</u>, 57 F.3d 1122, 1125 (D.C. Cir.1995) (internal quotation marks and citation omitted), including examining the statute's legislative history to "shed new light on congressional intent, notwithstanding statutory language that appears superficially clear," <u>id.</u> at 1127 (internal quotation marks and citation omitted). And, of course, "we must be guided to a degree by common sense as to the manner in which Congress is likely to delegate a policy decision . . . to an administrative agency." <u>Brown & Williamson</u>, 529 U.S. at 121, 120 S.Ct. 1291. If, applying these principles, we find that "Congress has directly spoken to the precise question at issue . . . that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." <u>Chevron</u>, 467 U.S. at 842-43, 104 S.Ct. 2778.

See <u>Sierra Club v. EPA</u>, 551 F.3d 1019, 1027 (D.C. Cir. 2008).

Only if Congress did not directly address in the statute in question the precise question presented to a court may the court proceed to step two of the two-step analysis under <u>Chevron</u> (sometimes, step two analysis). See <u>Chevron</u>, 467 U.S. at 842-843. In other words, only if the statute in question is silent or ambiguous with respect to the precise question presented may a court proceed to the step two analysis. See <u>id.</u> at 843.

If a court is permitted under the step one analysis to proceed to the step two analysis, the court must decide whether the answer of the agency to the precise question with respect to which the statute in question is silent or ambiguous is based upon a permissible interpretation of that statute. See id. In deciding that issue, a court "need not conclude that the agency construction was the only one it permissibly could have adopted to uphold the construction, or even the reading the court would have reached if the question had initially arisen in a judicial proceeding." Id. n.11. Under the step two analysis, a court may not substitute its own interpretation of the statute in question if the agency's construction of the statute is reasonable. See id. at 844. That is to say, under the step two analysis, a court may not conclude that a regulation is invalid, and instead must defer to the regulation, "unless * * * [it is] arbitrary, capricious, or manifestly contrary to the statute." Id. at 844; see Mayo Found., 562 U.S. at 53 (quoting Household Credit Servs., Inc. v. Pfennig, 541 U.S. 232, 242 (2004)).

We turn now to the parties' disagreement over the application of the two-step analysis of Chevron to the undisputed facts here. With respect to the step one analysis, it is respondent's position that the inquiry under that analysis with respect to petitioner, a foreign corporation which sought the benefits of section 883(a)(1) for its taxable year 2007 and the shares of which were issued in bearer

form, is "whether the text of the statute and its legislative history speaks with the precision necessary to say definitively whether ownership [by individuals] of [such] a foreign corporation can be established for purposes of section 883(c)(1) through bearer shares."[18]  The answer to that inquiry, respondent maintains, is that neither the text of the statute nor its legislative history speaks with the precision necessary to say definitively whether ownership by individuals of such a foreign corporation may be established for purposes of section 883(c)(1) through bearer shares.  Consequently, according to respondent, it is necessary to proceed to the step two analysis under Chevron.

Petitioner agrees with respondent that "the first question [under Chevron] * * * is 'whether Congress has directly spoken to the precise question at issue,' because, '[i]f the intent of Congress is clear, that is the end of the matter'."  Petitioner also agrees with respondent that section 883(c)(1) "is silent with respect to how a foreign corporation can establish ownership."  According to petitioner, "[s]ection 883(c)(1) is silent on substantiation of ownership presumably because Congress expected the Respondent to address the subject in regulations."  None-theless, petitioner disagrees with respondent that, because section 883(c)(1) is

---

[18]Sec. 883(c)(4), titled "Stock Ownership Through Entities", provides certain rules for purposes of sec. 883(c)(1) where stock is owned directly or indirectly by or for a corporation, partnership, trust, or estate.  See supra note 16.

silent with respect to how to establish or substantiate ownership under that section, there is a gap in section 883(c)(1) that the Treasury Secretary may address.

According to petitioner,

> [r]espondent conflates substantiation of ownership and ownership. "Owned" [in section 883(c)(1)] is commonly understood to include all types of ownership. Proof of ownership is not synonymous with the existence of ownership itself.
>
> * * * It would be Orwellian to interpret the word[] "owned" [in section 883(c)(1)] to deny ownership of bearer shares because 'owned' [in section 883(c)(1)] is silent as to how ownership of such shares can be proved.
>
> * * * The plain language Congress employed [in section 883(c)(1)]-- "owned"--identifies the key issue--"ownership" that can only reasonably be interpreted to mean any form of ownership.
>
> The reality is that the Challenged Provisions [bearer share regulations] prohibit proof of ownership of bearer shares even though they concede that such shares are owned by individuals. The Challenged Provisions fail Chevron Step 1.

Petitioner further elaborates in pertinent part on its position regarding the step one analysis as follows:

> According to the Supreme Court, absent an express indication to the contrary, Congress intends the words it uses in its enactments to carry "'their ordinary, contemporaneous, common meaning.'" * * * In this case, Congress gave no indication that it intended the words of Section 883[(c)(1)] to have anything other than their ordinary common meaning.

* * * The 1982 edition of <u>American Heritage Dictionary</u> defined "own" as, "to have or possess . . . to obtain possession of what belongs to one."  Similarly, the 1986 edition of <u>Webster's New International Dictionary</u> defined "own" as, "to have or hold property or appurtenance; have a rightful title to, whether legal or natural; possess . . .

\*        \*        \*        \*        \*        \*        \*

The language of Section 883(c)(1) leaves little, if any, room for interpretation at least with respect to the use of the words, ["]is owned by individuals["].  However, to the extent the Treasury Department interprets "is owned by individuals" in the Section 883 Regulations, it is bound by the ordinary, common meaning of the words used in the statute.

With respect to the meaning of the words, "is owned by individuals" in Section 883, the Challenged Provisions adopt a meaning that contradicts the unambiguous language used by Congress.  * * *

The fatal flaw in the Challenged Provisions is that they write the words "is owned by individuals" out of Section 883[(c)(1)], at least with respect to bearer shares, thereby denying the Petitioner and its controlling shareholders the opportunity to prove that they own these shares.  * * * [T]he Challenged Provisions deny the exclusion [under section 883(a)(1)] based solely on the kind of shares issued by Petitioner and owned by its shareholders. According to the Challenged Provisions, bearer shares cannot be "owned" by anyone for purposes of qualifying under Section 883.  This narrow interpretation of "owned" is counter-intuitive and squarely conflicts with the plain meaning and common usage of the words used in the statute.

\*        \*        \*        \*        \*        \*        \*

The Challenged Provisions fail the first and most basic test required of an agency's rules: they conflict with the plain language of the statute that they are intended to interpret.  Instead of promulgating

rules to provide guidance on how owners may prove ownership of bearer shares, the Challenged Provisions prohibit their use for Section 883 purposes by denying the benefit of "ownership" of such shares to their owners. [Citations and fn. refs. omitted.]

Petitioner's position under the step one analysis under Chevron and its arguments in support of its position are similar to the taxpayers' position under that analysis and their arguments in support of their position in Mayo Found., 562 U.S. 44. In Mayo Found., the Supreme Court addressed the validity of certain regulations issued under section 3121(b)(10) (student FICA tax exemption) which exempts the service of "students" from tax on their wages under the Federal Insurance Contributions Act (FICA). In that case, Mayo Foundation for Medical Education and Research, Mayo Clinic, and the Regents of the University of Minnesota (collectively, Mayo organizations or the taxpayers) claimed that certain physicians, who had served during the tax period in question as medical residents in their respective medical residency programs and who had spent in that capacity between 50 and 80 hours a week on patient-related matters, should be viewed as students for purposes of the student FICA tax exemption. See id. at 47-48.

Certain longstanding regulations that were not at issue in Mayo Found. allowed the student FICA tax exemption under section 3121(b)(10) to students

who worked for their schools "as an incident to and for purposes of pursuing a course of study." Sec. 31.3121(b)(10)-2(d), Employment Tax Regs; see Mayo Found., 562 U.S. at 49. A determination of whether an individual's work was "incident" to the individual's studies had been made under those regulations on a case-by-case analysis. That case-by-case analysis was no longer required under certain regulations that the Treasury Secretary promulgated, effective for 2005, and that were at issue in Mayo Found. See Mayo Found., 562 U.S. at 49-50.

The regulations that were at issue in Mayo Found. provide that "[t]he services of a full-time employee", as defined by the employer's policies, but in any event including any employee who is normally scheduled to work 40 hours or more each week, "are not incident to and for the purpose of pursuing a course of study." Sec. 31.3121(b)(10)-2(d)(3)(iii), Employment Tax Regs.; see Mayo Found., 562 U.S. at 50-51. (We shall refer to the regulations at issue in Mayo Found. as the full-time employee regulations.)

The Mayo organizations commenced an action for refunds of the FICA taxes that they had withheld on the so-called stipends that they had paid to their respective residents during the second quarter of 2005. In support of their entitlement to the refund that they sought, it was the position of the Mayo organizations that their respective residents qualified for the student FICA tax

exemption and that the full-time employee regulations were invalid.  See Mayo Found., 562 U.S. at 51.  In support of that position, the Mayo organizations argued that under the step one analysis of Chevron the text of the statute involved is unambiguous and that "the dictionary definition of 'student' * * * plainly encompasses residents."  Id. at 51-52.

In Mayo Found., the Supreme Court specifically rejected the Mayo organizations' argument under the step one analysis of Chevron that the statute in question there was unambiguous, at least insofar as it applied to working professionals.  The Supreme Court held that that statute did not "'speak[ ] with the precision necessary to say definitively whether * * * [it] applies to' medical residents."  Id. at 52-53.

For reasons that are essentially the same as the reasons for which the Supreme Court rejected the taxpayers' position and their arguments in support of their position in Mayo Found. with respect to the application of the step one analysis under Chevron, 467 U.S. at 842-843, we reject petitioner's position and its arguments in support of its position with respect to the application of that step one analysis here.  We must decide under the step one analysis "whether Congress has directly spoken to the precise question at issue", Chevron, 467 U.S. at 842, of how ownership by individuals may be established for purposes of section

883(c)(1) by a foreign corporation seeking the benefits of section 883(a)(1). The words "owned by individuals" in section 883(c)(1) do not, as petitioner appears to acknowledge, explain or otherwise address how to establish ownership by individuals for purposes of section 883(c)(1), let alone how to establish ownership where the shares of the foreign corporation are owned in bearer form. The dictionary definitions of the word "own" on which petitioner relies,[19] which petitioner claims are unambiguous definitions, do not address the problem under section 883(c) of determining how to establish ownership by individuals for purposes of section 883(c)(1) that the Internal Revenue Service (IRS) confronts when it examines a return of a foreign corporation seeking the benefits of section 883(a)(1) for a prior taxable year. In any such examination, the IRS must determine after the fact whether during at least one-half of the total number of days in that prior taxable year 50% or more of the value of the stock of that corporation was owned by individuals who were not residents of a foreign country that granted an equivalent exemption to U.S. corporations. In that event, section 883(c)(1) would preclude that foreign corporation for that prior taxable year from excluding from gross

---

[19]As noted above, according to petitioner, the dictionary definitions of the word "own" are "to have or possess . . . to obtain possession of what belongs to one" and to have or hold property or appurtenance; have a rightful title to, whether legal or natural; possess".

income and exempting from U.S. taxation under section 883(a)(1) the income described in section 883(a)(1).

We conclude that "Congress has [not] directly spoken to the precise question at issue", Chevron, 467 U.S. at 842, of how ownership by individuals may be established for purposes of section 883(c)(1) by a foreign corporation seeking the benefits of section 883(a)(1), including such a foreign corporation the shares of which were issued in bearer form. We also conclude that section 883(c)(1) as well as its legislative history is silent--there is a gap in that section as well as its legislative history--as to how ownership by individuals may be established for purposes of section 883(c)(1) by a foreign corporation seeking the benefits of section 883(a)(1), including such a foreign corporation the shares of which were issued in bearer form. We hold that the Treasury Secretary was authorized under Chevron to fill that gap by promulgating regulations. See Chevron, 467 U.S. at 842-843.

We consider now the step two analysis under Chevron. It is respondent's position under that analysis that the bearer share regulations are a reasonable construction of section 883(c)(1). It is petitioner's position under the step two analysis that the bearer share regulations are contrary to the plain language of section 883(c)(1) and its legislative history. Consequently, petitioner maintains,

those regulations are not a reasonable interpretation of section 883(c)(1) but are arbitrary and capricious and were promulgated "for the administrative convenience" of the Treasury Department.  In support of its position, petitioner argues (1) that the IRS should allow all foreign corporations the shares of which were issued in bearer form to establish the ownership of their respective shares, including ownership for prior taxable years, on a case-by-case basis and (2) that the Treasury Secretary unreasonably, arbitrarily, and capriciously distinguished in the bearer share regulations between ownership through bearer shares and ownership through shares issued to named persons and "denied attribution of ownership to holders of bearer shares," thereby "effectively redefin[ing] 'is owned' [in section 883(c)(1)] to exclude ownership of such shares."

As was true of its position and arguments under the step one analysis, petitioner's position under the step two analysis under Chevron and its arguments in support of its position are similar to the taxpayers' position under the step two analysis[20] and their arguments in support of their position in Mayo Found., 562

---

[20]The Mayo organizations initially took the position in Mayo Found. that the step two analysis of Chevron was not the appropriate framework within which to analyze what the Supreme Court held in that case was an ambiguous statute. According to those organizations, the multifactor analysis of Nat'l Muffler Dealers Ass'n, Inc. v. United States, 440 U.S. 472 (1979), was the proper analysis to use in reviewing an ambiguous Federal tax statute.  See Mayo Found. 562 U.S. at 53-54.

(continued...)

U.S. 44.  In Mayo Found., the Mayo organizations argued under the step two analysis of Chevron (1) that the Commissioner "should be required to engage in a case-by-case inquiry into" specifically what each medical resident does and why each such resident does it and (2) that the Treasury Secretary arbitrarily distinguished in the full-time employee regulations between so-called hands-on training and classroom instruction.  See id. at 58-59.  The Supreme Court rejected those arguments in Mayo Found.  In doing so, the Supreme Court concluded:

> Regulation, like legislation, often requires drawing lines. * * * Focusing on the hours an individual works and the hours he spends in studies is a perfectly sensible way of accomplishing that goal [of distinguishing between workers who study and students who work]. The [Treasury] Department explained that an individual's service and his "course of study are separate and distinct activities" in "the vast majority of cases," and reasoned that "[e]mployees who are working enough hours to be considered full-time employees . . . have filled the conventional measure of available time with work, and not study." * * *  The Department thus did not distinguish classroom education from clinical training but rather education from service.  The Department reasonably concluded that its full-time employee rule would "improve administrability," * * * and it thereby "has avoided the wasteful litigation and continuing uncertainty that would inevitably accompany any purely case-by-case approach"  like the one [the] Mayo [organizations] advocate[].  * * *

Id. at 59.

---

[20](...continued)
In rejecting that position, the Supreme Court held:  "The principles underlying our decision in Chevron apply with full force in the tax context."  Id. at 55.

Petitioner does not appear to dispute that its position and its arguments under the step two analysis of Chevron with respect to the bearer share regulations are similar to the position and the arguments under that analysis that the taxpayers advanced in Mayo Found., 562 U.S. 44, with respect to the full-time employee regulations at issue there and that the Supreme Court rejected. Petitioner maintains, however, that we should not reject its position and its arguments under the step two analysis with respect to the bearer share regulations. That is because, according to petitioner, it is relying on the "same logic" upon which it claims the Supreme Court relied in upholding the full-time employee regulations at issue in Mayo Found. Petitioner asserts:

> The logic the Supreme Court used to uphold * * * [the full-time employee regulations] in Mayo is the same logic the Petitioner relies on to invalidate the * * * [bearer share regulations]. In Mayo, the Supreme Court reasoned that the medical residents [involved in that case] shared all of the basic characteristics of full-time employees (benefits, duties, etc.). The fact that there was an element of schooling involved in the medical residencies did not transform full-time employees into students for FICA purposes.

> In Mayo, the Supreme Court ruled that it was logical and reasonable for the Treasury Department to look at the educational aspects of the medical residents' routines, compare it [sic] to their other duties, and conclude that they were workers much more than they were students for purposes of FICA taxes.

According to petitioner, in contrast to the full-time employee regulations at issue in Mayo Found., the bearer share regulations at issue here

> treat two like things, bearer shares and shares issued to named persons, as opposites even though they share the same characteristics of ownership * * *. There is no analysis or evaluation [in the bearer share regulations] of the differences between the types of shares, just a blanket denial of ownership or at least attribution of ownership for "qualified shareholder" purposes to owners of bearer shares.
>
> * * * It is true that ownership of shares issued in the name of the holder and recorded on the books and records of a corporation are easier to track, but there is no difference between them in terms of "being owned."

We reject petitioner's position and its arguments in support of its position with respect to the step two analysis under Chevron. The bearer share regulations are not, as petitioner asserts, "just a blanket denial of ownership or at least attribution of ownership for 'qualified shareholder' purposes to owners of bearer shares." Those regulations acknowledge that the shareholder(s) of a foreign corporation seeking the benefits of section 883(a)(1) the shares of which were issued to the stockholder(s) in bearer form owns, directly or indirectly, stock in that corporation. See, e.g., sec. 1.883-4(b)(1)(ii), (c)(1), Income Tax Regs. However, the bearer share regulations provide that the bearer shares of that foreign corporation which the stockholder(s) owns may not be taken into account in establishing the ownership of the stock of the foreign corporation for purposes of determining

whether the foreign corporation is described in section 883(c)(1) and thus whether it is entitled to the benefits of section 883(a)(1). The Treasury Department took that position when it first proposed regulations under section 883 in 2000 pursuant to notice-and-comment procedures[21] after Congress added section 887 to the Code and amended section 883 in the 1986 Act, when it reproposed regulations under section 883 in 2002 pursuant to notice-and-comment procedures, and when it finalized regulations under section 883 in 2003 that apply for petitioner's taxable year 2007. See 65 Fed. Reg. 6065 (Feb. 8, 2000) (2000 proposed section 883 regulations); 67 Fed. Reg. 50510 (Aug. 2, 2002) (2002 reproposed section 883 regulations); T.D. 9087, 2003-2 C.B. 781 (applicable final section 883 regulations). The Treasury Department did so because of "the difficulty of reliably demonstrating the true ownership of such [bearer] shares". See 67 Fed. Reg. 50518.

In issuing the 2000 proposed section 883 regulations and the 2002 reproposed section 883 regulations and in promulgating the applicable final section 883 regulations, the Treasury Secretary had in mind and was concerned with imple-

---

[21]As discussed above, the Supreme Court concluded in Mayo Found., 562 U.S. at 58-59, that if regulations or rules are issued after notice-and-comment procedures, that fact is a "'significant' sign" that those regulations or rules merit deference under Chevron.

menting the intent of Congress when it amended section 883 in the 1986 Act. In this regard, the Treasury Secretary had in mind and was concerned with establishing or identifying the ultimate beneficial owners of a foreign corporation seeking the benefits of section 883(a)(1) and preventing such a corporation whose individual owners are described in section 883(c)(1) from securing those benefits, as Congress intended when it amended section 883 in the 1986 Act.

As discussed above, when Congress amended section 883 in the 1986 Act, it required that any foreign corporation seeking to obtain the benefits of section 883(a) satisfy a stricter standard than section 883 had required before that amendment. A foreign corporation's entitlement under section 883(a)(1) to exclude certain income from gross income and exempt that income from U.S. tax no longer was based solely upon the country in which the foreign corporation's vessel was registered or documented. Instead, Congress added in its amendment of section 883 in the 1986 Act a second hurdle to that favorable treatment by enacting section 883(c) in order to curb abuse by residents of certain foreign countries who owned stock in a foreign corporation that was seeking the benefits of section 883(a)(1) where those foreign countries did not provide an equivalent exemption to U.S. corporations.

In order to apply section 883(c)(1), the provision applicable here that Congress added to the Code in the 1986 Act, it is necessary to know the country of residence of the shareholders of the foreign corporation seeking the benefits under section 883(a)(1). When the Treasury Department proposed in 2000 and reproposed in 2002 regulations under section 883 and when it promulgated the applicable final section 883 regulations, that knowledge in the case of a foreign corporation the shares of which were issued in bearer form was virtually impossible to obtain because it was difficult to establish the ownership of those bearer shares, especially after the fact for prior taxable years.

Bearer shares are an unregistered form of stock certificates that do not identify the owner, but that confer ownership on whoever possesses the bearer stock certificates. See, e.g., 52 MIRC, pt. 1, div. 5, sec. 42(2);[22] see also Anderson v. Commissioner, T.C. Memo. 2009-44, 2009 WL 454182, at *2, aff'd, 698 F.3d 160 (3d Cir. 2012). A foreign corporation the shares of which are in bearer form may be conveyed simply by transferring physical possession of the shares. E.g., 52 MIRC, pt. 1, div. 5, sec. 42(2) ("The transfer of bearer shares shall be by delivery of the certificates."). Thus, a principal advantage of ownership of a

---

[22]As noted above, petitioner was organized as a corporation under the laws of the Marshall Islands.

foreign corporation through bearer shares is the ability to transfer quickly and anonymously the ownership of those shares. Bearer shares make it virtually impossible to know who the actual shareholders or owners of a corporation are because the only proof of ownership is physical possession at a particular point in time of the paper bearer share certificate. See id. Bearer shares generally are not registered with any central authority, regulatory agency, or tax office. See, e.g., id.; see also Anderson v. Commissioner, 2009 WL 454182, at *2. Indeed, we believe that petitioner acknowledges that it was frequently not able to track the transfer of bearer shares from one person to another person. That is because the parties stipulated that during petitioner's taxable year 2007, petitioners did not maintain (1) a stock register, a ledger listing the name(s) of the owner(s) of the bearer share certificate(s), or a stock transfer book; (2) an immobilized book-entry system in which evidence of ownership of its bearer shares was maintained in its books and records; or (3) an immobilized book-entry system in which evidence of ownership of its bearer shares was maintained by a broker or financial institution.

In contrast to registered shares, no name is shown on a bearer share certificate that a company issues. Rather, any person who has physical possession of the bearer share certificate is recognized as a shareholder or owner of the company. See, e.g., 52 MIRC, pt. 1, div. 5, sec. 42(2); see also Anderson v. Commissioner,

2009 WL 454182, at *2.  It is extremely easy to convey or transfer the ownership of a company that is incorporated with the authority to, and that does, issue its stock in bearer form.  The mere delivery, or transfer of possession, of the company's stock certificate issued in bearer form to another person effects a change of ownership.  No additional actions are necessary.  See, e.g., 52 MIRC, pt. 1, div. 5, sec. 42(2).  Consequently, if a person possessing bearer share certificates intends, or purports, to transfer those bearer shares to another person, all that the person possessing the bearer shares certificates must do to effect any such transfer is to give those certificates to the other person.  See, e.g., id.  There is no need for any paperwork or changes to the registry of the company because only the number of bearer shares that was issued to create the company and the numeration of those shares are shown on the physical bearer share certificate, without making any reference to or identifying the owners.[23]  See, e.g., id.  Because of the manner in which ownership of the stock of a company the shares of which were issued in bearer form is conveyed or transferred, the shareholder(s) of the company remain

---

[23]As discussed above and as the parties stipulated, petitioner maintained no shareholders register, ledger showing the name(s) of the owner(s) of the bearer shares, or stock transfer book.

in almost complete anonymity.  Any change in the identity of such a company is, and remains, a completely confidential act.[24]

When the Treasury Department issued the 2000 proposed section 883 regulations and the 2002 reproposed section 883 regulations and when it promulgated the applicable final section 883 regulations, it included rules in those respective regulations with respect to the treatment of stock owned through bearer shares in a foreign corporation seeking the benefits of section 883(a)(1).  At those respective times and at other relevant times, the confidentiality or anonymity with which bearer shares could have been conveyed or transferred had been and continued to be a problem in the international community, and specifically in the shipping industry.  For example, in 1998, the Organisation for Economic Co-operation and Development (OECD) Committee on Fiscal Affairs issued a report identifying bearer shares as one of the most harmful tax characteristics globally of certain tax systems.  See OECD, Committee on Fiscal Affairs, Harmful Tax Competition:  An Emerging Global Issue 33 (April 1998), http://www.oecd.org/

---

[24]Moreover, we agree with respondent that the act of improperly depositing bearer share certificates with a custodian would raise additional concerns and evidentiary issues requiring determinations by a court or other authority, possibly a foreign court or another foreign authority, relating to the intent behind certain custodial deposits that may construed as transfers of bearer shares.  See Goldsmith v. Commissioner, 86 T.C. 1134, 1142-1144 (1986); Goldsmith v. Commissioner, T.C. Memo. 1986-227, 1986 WL 21934.

tax/transparency/44430243.pdf.  As a further example, in 2001, the OECD Steering Group on Corporate Governance issued a report in which it identified bearer shares as one of the most common and effective mechanisms of providing total anonymity regarding beneficial ownership of the company issuing the bearer shares.  See OECD, Steering Group on Corporate Governance, Behind the Corporate Veil:  Using Corporate Entities for Illicit Purposes 29-30 (November 2001), http://www.oecd.org/daf/ca/43703185.pdf.  As a final example, in 2003, the OECD Maritime Transport Committee issued a report in which it identified bearer shares as one of the most common and effective mechanisms of providing total anonymity regarding beneficial ownership of a company in the shipping industry issuing the bearer shares.  See OECD, Maritime Transport Committee, Ownership and Control of Ships 8 (March 2003), http://ntl.bts.gov/lib/24000/24400/24410/17846120.pdf.

Because of the problems of establishing for purposes of section 883(c)(1) the ownership by individuals of bearer shares, the Treasury Department proposed regulations in 2000 and reproposed regulations in 2002 under section 883 which did not take bearer shares into account in establishing the ownership of the stock of a foreign corporation for purposes of determining whether the foreign corporation is described in section 883(c)(1) and thus whether it is entitled to the benefits

of section 883(a)(1). Those proposed and reproposed bearer share rules in those proposed and reproposed section 883 regulations were virtually identical to the bearer share regulations in the final regulations under section 883 that the Treasury Department promulgated in 2003 and that are at issue here. The Treasury Department explained that although it had received public comments recommending that it modify the bearer share rules in the 2000 proposed section 883 regulations, it did not do so. The Treasury Department gave the following explanation for its decision not to change those bearer share rules when it issued the 2002 reproposed section 883 regulations:

> Bearer Shares. Section 1.883-4(b)(1)(ii) of the 2000 proposed regulations provides that a shareholder is a qualified shareholder only if the shareholder does not own its interest in the foreign corporation through bearer shares, either directly or by applying the attribution rules of § 1.883-4(c).
>
> Several commentators criticized this rule. They contended that the restriction on the use of bearer shares raises concerns of fundamental fairness and that the IRS should not attempt to regulate the personal property rights of nonresident alien individuals. These commentators suggested that the rule should be deleted or substantially modified to allow the use of bearer shares whose ownership can be substantiated to the satisfaction of the Commissioner.
>
> Due to the difficulty of reliably demonstrating the true ownership of such shares, the [2002] reproposed [section 883] regulations do not adopt this suggestion, in the interest of sound tax administration.

67 Fed. Reg. 50518 (Aug. 2, 2002).

When the Treasury Department promulgated the applicable final section 883 regulations, which included the bearer share regulations at issue, it pointed out the inherent difficulty that arises in attempting to establish ultimate ownership of bearer shares for purposes of section 883(c)(1). See T.D. 9087, 2003-2 C.B. at 786.

We conclude that the bearer share regulations do not contravene section 883(c)(1) but are a reasonable construction of that section which provides the IRS with the appropriate tools needed to enforce section 883. The bearer share regulations provide certainty and resolve the difficult problems of proof associated with establishing ownership of bearer shares, especially for prior taxable years. In not allowing bearer shares to be taken into account in establishing the ownership of the stock of a foreign corporation for purposes of determining whether the foreign corporation is described in section 883(c)(1) and thus whether it is entitled to the benefits of section 883(a)(1), the bearer share regulations set forth a sensible approach to effecting the intent of Congress in enacting section 883(c)(1) to ensure that abuse will not occur which will result in certain types of shipping transportation income described in section 883(a)(1) not being taxed. We believe that the rigid framework that the Treasury Department adopted in the bearer share regulations in the applicable final section 883 regulations, as well as in other

portions of those final regulations, for determining whether a foreign corporation seeking the benefits of section 883(a)(1) is described in section 883(c)(1) is consistent with section 883(c)(1) and with the intent of Congress in amending section 883 in the 1986 Act. We also conclude that the bearer share regulations are consistent with the admonition of the Supreme Court that "exemptions from taxation are to be construed narrowly." Bingler v. Johnson, 394 U.S. 741, 752 (1969).

We hold that the Treasury Department did not act unreasonably, arbitrarily, or capriciously or in violation of section 883(c)(1) or its legislative history when it interpreted that section in the bearer share regulations in a way that precluded a foreign corporation the shares of which were issued in bearer form from taking such shares into account in establishing the ownership of the stock of the foreign corporation for purposes of determining whether the foreign corporation is described in section 883(c)(1) and thus whether it is entitled to the benefits of section 883(a)(1).

We hold that the bearer share regulations satisfy the step one analysis and the step two analysis under Chevron. We hold that those regulations are valid. Petitioner acknowledges that if we were to hold that the bearer share regulations

are valid, which we have, it is not entitled for its taxable year 2007 to exclude from its gross income or exempt from U.S. taxation its USSGTI of $3,587,375.

We have considered all of the contentions and arguments of petitioner that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing,

An order granting respondent's motion and denying petitioner's motion and decision for respondent will be entered.